UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| JOHN DOE,<br><br>                   Plaintiff,<br><br>             -against-<br><br>DONALD J. TRUMP, as President of the United States of America; JOHN F. KELLY, as Secretary of the Department of Homeland Security; THE DEPARTMENT OF HOMELAND SECURITY; LORI SCIALABBA, as Acting Director of the U.S. Citizenship and Immigration Services; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; REX W. TILLERSON, as Secretary of State; U.S. DEPARTMENT OF STATE; and THE UNITED STATES OF AMERICA,<br><br>             Defendants. | **Civil Action No.: 17-cv-112**<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.     Plaintiff is a Sunni Muslim asylee who, after being fully vetted by U.S. immigration authorities, was granted asylum status because of the torture and religious persecution he had suffered in Syria.  He thereafter filed a derivative asylum application in order to reunite with his loving wife and his only surviving child, a three-year-old daughter he has not seen since March 2014, who remain in war-torn Syria.

2.     On January 27, 2017, however, President Trump signed an executive order (the "Executive Order") indefinitely suspending entry of Syrian refugees into the United States — and stopping Plaintiff's derivative asylum application in its tracks.  The Executive Order effectuates President Trump's long-standing campaign promise of implementing a "total and complete shutdown of Muslims entering the United States."  It is also unlawfully and unconstitutionally

preventing Plaintiff from reuniting with his wife and young daughter, and this Court should set it aside.

## PARTIES

3.      Plaintiff John Doe was granted asylum status in May 2016 and his meritorious derivative asylum petition for his wife and daughter is pending.  He resides in the Western District of Wisconsin.  He will file a motion to proceed in this Court anonymously in order to protect his wife and daughter from harm that they stand to suffer in Aleppo, where they currently reside, should Plaintiff's identity be revealed.

4.      Defendant Donald J. Trump is President of the United States.  President Trump signed the Executive Order that is the subject of this action.  He is sued in his official capacity.

5.      Defendant John F. Kelly is the Secretary of the Department of Homeland Security. Defendant Kelly is responsible for implementing the Immigration and Nationality Act ("INA") and the Executive Order that is the subject of this action.  He is sued in his official capacity.

6.      Defendant Department of Homeland Security ("DHS") is a cabinet department within the U.S. federal government.  Its functions include regulating entry into the United States and granting asylees prior approval to travel internationally.   It is also responsible for implementing and enforcing the INA.

7.      Defendant Lori Scialabba is the Acting Director of the U.S. Customs and Immigration Services.  She is sued in her official capacity.

8.      Defendant U.S. Customs and Immigration Services ("USCIS") is an agency within DHS whose primary functions include adjudication of asylum and derivative asylum claims.

9.      Defendant Rex W. Tillerson is the U.S. Secretary of State.  The Secretary of State has authority to determine and implement certain asylum procedures for non-citizens.  Defendant Tillerson is sued in his official capacity.

10.     Defendant U.S. Department of State ("State Department") is responsible for, *inter alia*, issuance of visas for asylees and derivative asylees seeking entry into the United States.

## JURISDICTION AND VENUE

11.     There is federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under Article II of the Constitution, the First Amendment, the Fifth Amendment, the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1152, 1182(f), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553, 706.  Additionally, there is jurisdiction under 28 U.S.C. § 1346 (providing jurisdiction in civil actions against the United States) and 28 U.S.C. § 1361 (providing jurisdiction to compel officers and employees of the above-listed federal agencies to do her or his duty).  This Court has power to award the declaratory and injunctive relief requested herein under the Declaratory Judgment Act (28 U.S.C. §§ 2201–2202), the APA (5 U.S.C. § 706), and 28 U.S.C. § 1361.

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this district.

## FACTUAL ALLEGATIONS

I.     **Plaintiff is Granted Asylum Status by the United States**

13.     Plaintiff fled Syria to escape near-certain death at the hands of two sectarian military forces, the Sunni-aligned Free Syrian Army ("FSA") fighting against the Assad regime and the Alawite-aligned Syrian Arab Army fighting for the Assad regime ("SAA").  The FSA and SAA were vying for territorial control of Aleppo and both targeted Plaintiff.  The FSA targeted him because Plaintiff lived in a part of Aleppo controlled by the SAA, and the FSA wrongly assumed that Plaintiff was sympathetic to the SAA.  The SAA targeted Plaintiff because of his religious faith and because he travelled to FSA-controlled territory to manage his family's business.

14.     Members of the FSA and SAA extorted, falsely imprisoned, and tortured Plaintiff, and they threatened Plaintiff with death.  Members of the SAA also threatened to rape his wife. Following torture and imprisonment at the hands of the SAA, the FSA placed Plaintiff on a "kill list" and the SAA attempted to conscript him.  Plaintiff fled Syria at the urging of his friends and family.

15.     Upon arriving in the United States in March 2014, Plaintiff requested asylum, and a USCIS officer determined that Plaintiff has established a credible fear of returning to Syria. Plaintiff filed an initial Application for Asylum and Withholding of Removal with the USCIS and awaited a response, eager to find a way to bring his wife and children to safety in the U.S.

16.     By summer of 2015, with Plaintiff's asylum application still pending, the security situation in Syria further deteriorated.  In July 2015, Plaintiff's three-year-old son fell three floors to his death while attempting to escape militia rocket fire that hit his home.  Following his son's death, Plaintiff filed a petition for Humanitarian Parole with USCIS in an attempt to secure the lives and wellbeing of his wife and daughter.  That petition was rejected and Plaintiff subsequently filed an amended asylum application.

17.     On May 27, 2016, a USCIS Immigration Judge in Chicago granted Plaintiff asylum. In so ruling, the Immigration Court made a finding that returning Plaintiff to Syria would threaten his life or freedom and would thus violate the United Nations Convention Against Torture and the INA.  DHS did not appeal the decision, which became final at the end of June 2016.

## II.     Plaintiff's Derivative Asylum Petition Remains Pending

18.     On July 5, 2016, having received asylum status, Plaintiff filed a Refugee/Asylee Relative Petition with the USCIS.  The application sought derivative asylum for his wife and daughter, pursuant to INA § 208(b)(3) and 8 C.F.R. § 208.21.

19.     Plaintiff's derivative asylum petition conforms to applicable laws and agency regulations and establishes that Plaintiff is an asylee and that both his wife and daughter are qualifying beneficiaries.

20.     Upon information and belief, the petition was reviewed at USCIS's Nebraska processing center and was found in order.  Upon information and belief, the petition was then forwarded to the USCIS's Milwaukee office for a thorough security vetting of Plaintiff's wife and daughter.  Upon information and belief, after security vetting cleared, the petition was returned to Nebraska for final processing — that processing was halted on January 27, 2017.

21.     Barring Plaintiff's wife and three-year-old daughter entry into the United States plays no conceivable role in furthering the ostensible purpose of the Executive Order, which is allegedly to prohibit the entry of aliens with hostile attitudes toward the United States and its values.

22.     Plaintiff's wife does not bear hostile attitudes toward the United States and its founding principles.  She supports the Constitution and has never and would never place violent ideologies over American law.  She has not engaged in acts of bigotry or hatred (including "honor" killings, other forms of violence against women, or the persecution of those who practice religions different from her own) and has never oppressed Americans of any race, gender, or sexual orientation.

23.     Similarly, Plaintiff's three-year-old daughter does not bear hostile attitudes toward the United States and its founding principles, and indeed is incapable of doing so.  She also does not oppose the Constitution and does not place violent ideologies over American law (and, again, is incapable of doing so).  She also has not engaged in acts of bigotry or hatred (including "honor" killings, other forms of violence against women, or the persecution of those who practice religions

different from her own) and has never oppressed Americans of any race, gender, or sexual orientation.

24.     Until Plaintiff's meritorious derivative asylum petition is granted and the State Department issues the requisite visas, his wife and daughter remain trapped in Syria.  They are living in a war zone, far away from Plaintiff, and in hiding to avoid rape or murder at the hands of the SAA.  They lack adequate food, shelter, and basic medical care.  In short, their lives are in real and imminent danger.

## III.   President Trump Issues the Executive Order Banning Muslims and Refugees

### A.   President Trump Ran on a Platform of Banning or Limiting Muslim Immigration to the United States.

25.     The Executive Order effectuates President Trump's campaign promise, made on December 7, 2015, to enact a "complete shutdown of Muslims entering the United States."  *See* Declaration of Andrew B. Breidenbach in Support of Plaintiff's Application for a Temporary Restraining Order, Preliminary Injunction, and Summary Judgment, to be filed February 13, 2017 ("Breidenbach Decl.") Ex. A.   The press release continued: "there is great hatred towards Americans by large segments of the Muslim population."  *Id.*

26.     The next day, during an interview discussing his Muslim ban policy, Trump confirmed a reporter's characterization that airline and U.S. government officials would ask people seeking to enter the United States, "Are you Muslim?"  "[I]f they said, 'yes,' they would not be allowed in the country."  Breidenbach Decl. Ex. B

27.     During his campaign, Trump consistently adhered to the policy of banning Muslims from U.S. soil, stating on March 9, 2016 that "Islam hates us."  Breidenbach Decl. Ex. C.

28.     Trump refused to distinguish between the Muslim faith and Muslim terrorists, saying that "[i]t's very hard to separate [radical Islam and Islam itself], because you don't know

who is who. . . .  There's a sickness going on that's unbelievable.  And honestly, you have to get to the bottom of it."  Breidenbach Decl. Ex. C.

29.    At a nationally televised Republican debate the next day, Trump claimed that "large portions of a group of people, of Islam, . . . want to use very, very harsh means.  Let me go further.  Women are treated horribly. . . .  Women are treated horribly, and other things are happening that are very, very bad."  Breidenbach Decl. Ex. D.

30.    On June 13, 2016, Trump reiterated his promise to ban all Muslims entering this country until "we as a nation are in a position to properly and perfectly screen those people coming into our country."  Breidenbach Decl. Ex. F.

31.    On June 14, 2016, at a campaign rally in Greensboro, North Carolina, Trump attacked "[t]he children of Muslim immigrant parents," stating,  "they're responsible for a growing number . . . of terrorist attacks."  Breidenbach Decl. Ex. G.

32.    On July 17, 2016, in an interview with 60 Minutes, when confronted with the fact that a 'Muslim ban' would be unconstitutional, Trump responded "So you call it territories, ok?  We're gonna do territories.  We're gonna not let people come in from Syria."  Breidenbach Decl. Ex. EE.

33.    In a foreign policy speech delivered on August 15, 2016, Trump noted that the United States could not "adequate[ly] screen[]" immigrants because it admits "about 100,000 permanent immigrants from the Middle East every year."   Breidenbach Decl. Ex. I.   During the speech, Trump proposed creating an ideological screening test for immigration applicants, which would "screen out any who have hostile attitudes towards our country or its principles — or who believe that Sharia law should supplant American law."  *Id.*  During the speech, he referred to his proposal as "extreme, extreme vetting."  *Id.*

34.     On January 20, 2017, Donald J. Trump was inaugurated as President of the United States.  In his first television interview as President, he again referred to his plan for "extreme vetting: we're not letting people in if we think there's even a little chance of some problem." Breidenbach Decl. Ex. L.

35.     On January 27, 2017, just prior to executing the Executive Order, President Trump gave an interview on the Christian Broadcasting Network.  During that interview, President Trump confirmed his intent to prioritize Christians in the Middle East for admission as refugees, asserting (falsely) that "[i]f you were a Muslim you could come in [to the United States], but if you were a Christian, it was almost impossible . . . . And I thought it was very, very unfair.  So we are going to help them."  Breidenbach Decl. Ex. M.

**B.     President Trump Signs and Implements the Executive Order.**

36.     On January 27, 2017, one week after being sworn in, President Trump signed Executive Order 13769, titled "Protecting the Nation from Foreign Terrorist Entry into the United States."  Breidenbach Decl. Ex. N.

37.     During a signing ceremony for the Executive Order on January 27, 2017, President Trump stated, "Protection of the nation from foreign terrorist entry into the United States. . . . We all know what that means."  Breidenbach Decl. Ex. P.  He then added: "We all know what that means."  *Id.*

38.     The Executive Order directs a series of changes to the manner in which non-citizens may seek and obtain entry into the United States and affects Plaintiff's pending asylum application in several respects.

39.     At the outset, Section 3(c) of the Executive Order proclaims that entry of immigrants and nonimmigrants from seven Muslim-majority countries referred to in INA § 217(a)(12), 8 U.S.C. § 1187(a)(12), including Syria, "would be detrimental to the interests of the

United States."  (The other affected countries are Iran, Iraq, Libya, Somalia, Sudan, and Yemen.)  The Executive Order "suspend[s] entry into the United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this order."  Section 3(g) permits the Secretaries of State and Homeland Security to, on a "case-by-case basis, and when in the national interest, issue visas or other immigration benefits to nationals of countries for which visas and benefits are otherwise blocked."

40.     Section 5(a) of the Executive Order suspends for 120 days the United States Refugee Admissions Program ("USRAP").  When USRAP resumes, section 5(b) requires the Secretaries of State and Homeland Security "to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality."  Section 5(g) allows the Secretaries of State and Homeland Security to exercise their discretion to admit refugees barred by section 5(a), "but only so long as they determine that the admission of such individuals as refugees is in the national interest—including[, *inter alia*,] when the person is a religious minority in his country of nationality facing religious persecution."

41.     Section 5(c) of the Executive Order proclaims that entry of Syrian refugees is "detrimental to the interests of the United States" and suspends their entry "***indefinitely***."  This ban applies whether or not a non-citizen Syrian seeking entry poses any individualized threat of violence or has any connection to terrorist organizations or activities—indeed, it applies to young children such as Plaintiff's three-year-old daughter and other individuals incapable of posing a threat to the national security interests of the United States.

42.     According to a study spanning 1975 to 2015, no fatal terrorist attack has been perpetrated in the United States by a national of one of the seven countries covered by Section 3(c)

of the Executive Order, nor have any Syrians been convicted of attempting a terrorist attack during this time frame.  Breidenbach Decl. Ex. K.  Conversely, nationals from other countries not subject to the Executive Order have perpetrated fatal attacks in the U.S.  Breidenbach Decl. Ex. S.

43.     In a recent joint declaration, ten former national security, foreign policy, and intelligence officials in the United States Government affirmed, under penalty of perjury, that "[a]s a national security measure, the [Executive] Order is unnecessary.  National security-based immigration restrictions have consistently been tailored to respond to: (1) specific, credible threats based on individualized information, (2) the best available intelligence and (3) thorough interagency legal and policy review.  This Order rests not on such tailored grounds, but rather, on (1) general bans (2) not supported by any new intelligence that the Administration has claimed, or of which we are aware, and (3) not vetted through careful interagency legal and policy review."  Breidenbach Decl. Ex. X.  These officials further declared that "[r]ebranding a proposal first advertised as a 'Muslim Ban' as 'Protecting the Nation from Foreign Terrorist Entry into the United States' does not disguise the Order's discriminatory intent, or make it necessary, effective, or faithful to America's Constitution, laws, or values."  *Id.* ¶ 9.

44.     If there was any doubt as to the Executive Order's anti-Muslim animus, it was dispelled on January 29, 2017 by Rudy Giuliani, who served as a surrogate during Trump's campaign.  In an interview with Fox News, Mr. Giuliani explained "the whole history" of the Executive Order: "[W]hen [Trump] first announced it, he said, 'Muslim ban.'  He called me up.  He said, 'Put a commission together. Show me the right way to do it legally.'"  Breidenbach Decl. Ex. Q.

45.     Consistent with President Trump's statements to the Christian Broadcasting Network, the Executive Order prioritizes the asylum applications of non-Muslims.  Sections 5(a)–

(b) of the Executive Order suspend the USRAP in its entirety for 120 days and then, upon its resumption, direct the Secretary of State to prioritize refugees who claim religious-based persecution, "provided that the religion of the individual is a minority religion in the individual's country of nationality."

46.     President Trump himself took to the media to announce that his "very, very strict ban" was "working out very nicely."  Breidenbach Decl. Ex. T.

47.     Then-Acting U.S. Attorney General Sally Yates disagreed with the President in a Department of Justice letter circulated on January 30, 2017, in which she stated that she was not "convinced that the Executive Order is lawful" and that, "for as long as [she] is the Acting Attorney General, the Department of Justice will not present arguments in defense of the Executive Order[.]" Breidenbach Decl. Ex. U.  Ms. Yates clearly indicated that she based her decision in part on "statements made by an administration or its surrogates close in time to the issuance of [the] Executive Order[.]"  *Id.*

48.     Meanwhile, more than two dozen cases have been filed in federal court challenging the Executive Order.  Among them is *Washington v. Trump*, originally filed by the State of Washington in the Western District of Washington.  The plaintiffs in that case obtained a temporary restraining order prohibiting nationwide enforcement at "United States borders and ports of entry" of sections 3(c), 5(a)–(c) in their entireties and of section 5(e) to the extent that section "purports to prioritize refugee claims of certain religious minorities."  *See Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040, at *2 (W.D. Wash. Feb. 3, 2017).  The temporary restraining order also prohibited the government from "proceeding with any action that prioritizes the refugee claims of certain religious minorities" under section 5(e).  *Id.*  A three-judge panel of the Ninth Circuit denied the government's request to stay the temporary restraining order in a *per*

*curium* opinion seven days later.  *Washington v. Trump*, No. 17-35105, 2017 WL 526497, at *1 (9th Cir. Feb. 9, 2017).

## IV.  The Executive Order Indefinitely Separates Plaintiff from his Immediate Family and Disfavors Plaintiff's Religion

49.     Absent the Executive Order, USCIS lacks a legal basis upon which to deny — much less to indefinitely refrain from adjudicating — Plaintiff's derivative asylum petition for his wife and daughter.

50.     Sections 3(c) and 5(a)–(c) of the Executive Order prohibit USCIS from adjudicating Plaintiff's petition.  The same provisions also bar the State Department from issuing visas to Plaintiff's wife and daughter for entry into the United States as derivative asylees.  Thus, as a direct result of the terms of the Executive Order, and despite the obvious merit of Plaintiff's derivative asylum petition, Plaintiff's family is indefinitely — and perhaps permanently — separated.  This separation deprives Plaintiff of the companionship of his wife and the custody and care of his only surviving child.

51.     In addition, Sections 3(g) and 5(e) impinge on Plaintiff's First Amendment Right by disfavoring his religion.

52.     Although the court in *Washington* issued a temporary restraining order barring enforcement of sections 3(c), 5(a)–(c), and 5(e) of the Executive Order, that injunctive relief is both temporary and applies only to enforcement at "United States borders and ports of entry."  *See Washington*, 2017 WL 462040, at *2.  Thus, it apparently does not address Plaintiff's harm with respect to his derivative asylum application.

53.     A leaked memorandum issued by Defendant Scialabba indicates that USCIS has not interpreted the temporary restraining order in *Washington* as applying to beneficiaries outside the United States, such as Plaintiff's family.  Breidenbach Decl. Ex. V.

54.     Upon information and belief, the State Department has instructed its embassies to cease interviewing and issuing derivative asylum visas for spouses ("V92" visas) and children ("V93" visas) of asylees.  Breidenbach Decl. Ex. R.

55.     As a result, Plaintiff's rights continue to be violated, his derivative asylum petition remains indefinitely suspended, and he continues to be separated from his family on the basis of the unlawful and unconstitutional Executive Order.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### DISCRIMINATION IN VIOLATION OF
### THE IMMIGRATION AND NATIONALITY ACT

56.     Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

57.     The Executive Order exceeds the President's lawful authority under section 212(f) of the INA, as interpreted in the context of the INA as a whole and as limited by specific provisions of the INA.

58.     For example, the INA prohibits discrimination in the issuance of immigrant visas based on race, nationality, place of birth, or place of residence.  8 U.S.C. § 1152(a)(1)(A).  The Executive Order, both facially and as implemented, discriminates on the basis of nationality, place of birth, and/or place of residence in the issuance of visas, in violation of the INA.

59.     Defendants' violations of the INA have harmed and continue to harm Plaintiff by, among other injuries, indefinitely denying him access to his family.

### SECOND CAUSE OF ACTION
### SUBSTANTIVE VIOLATION OF THE APA

60.     Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

61.     The APA prohibits federal agency action that is arbitrary, capricious, unconstitutional, or contrary to statute.  5 U.S.C. § 706(2)(A)–(C).

62.     In implementing the Executive Order, as alleged herein, Defendant federal agencies have acted in violation of the U.S. Constitution and federal statutes, thereby violating the APA.

63.     Defendants' violations of the APA have harmed and continue to harm Plaintiff by, among other injuries, indefinitely denying him access to his family.

### THIRD CAUSE OF ACTION
### PROCEDURAL VIOLATION OF THE APA

64.     Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

65.     The APA requires federal agencies to conduct formal rulemaking before engaging in action that impacts substantive rights and prohibits federal agency action that does not comply with the required procedures.  5 U.S.C. §§ 553, 706(2)(D).

66.     The INA and its implementing regulations set forth the substantive standards governing when individuals may enter the United States or be considered for asylum.   In implementing the Executive Order, Defendants have altered these substantive standards by suspending all entry by affected individuals, including Plaintiff's family, and foreclosing Plaintiff's ability to obtain derivative asylum for his wife and daughter based solely on their nationality, place of birth, and/or place of residence.

67.     Defendants did not follow the procedures required by the APA before taking these actions affecting substantive rights, thereby violating the APA.

68.     Defendants' violations of the APA have harmed and continue to harm Plaintiff by, among other injuries, indefinitely denying him access to his family.

**FOURTH CAUSE OF ACTION**
**FIFTH AMENDMENT – DEPRIVATION OF SUBSTANTIVE AND PROCEDURAL**
**DUE PROCESS RIGHTS**

69.     Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

70.     The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving individuals of their fundamental rights and important liberty interests without due process of law.

71.     Plaintiff's fundamental rights include his right to the "integrity of [his] family unit." *Stanley v. Illinois,* 405 U.S. 645, 651 (1972); *see also Moore v. City of E. Cleveland*, 431 U.S. 494, 503–05 (1977) ("Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition."). Plaintiff's fundamental rights as a parent also include his right to the custody, care, and management of his daughter and the right to "give [his daughter] religious training and to encourage [her] in the practice of religious belief." *Prince v. Massachusetts*, 321 U.S. 158, 165 (1944).

72.     The Executive Order directly and substantially infringes on Plaintiff's fundamental rights. Plaintiff cannot return to Syria — the Executive Order bars him from travelling outside the United States — but even if he could, he would likely be murdered. And Plaintiff's wife and daughter cannot come to the United States because their derivative applications are *indefinitely* suspended by the Executive Order.

73.     The Due Process Clause forbids Defendants from infringing on Plaintiff's fundamental rights unless the infringement is narrowly tailored to serve a compelling governmental interest. On its face and as applied, the Executive Order fails this test. It is not

narrowly tailored to protect national security interests — it indefinitely blocks all persons from Syria from entry into the United States, regardless of their relationship to terrorism.  The overbreadth and irrationality of the Executive Order is strikingly apparent here: it blocks a three-year-old child from entry, stranding her in a country that DHS determined is too dangerous for her father.  Moreover, the Executive Order is a "Muslim ban" by another name.

74.     The Executive Order also infringes on Plaintiff's procedural due process rights. Plaintiff has a liberty interest to live together with his wife and child in the United States. *See*, *e.g.*, *Stanley*, 405 U.S. at 651.  This liberty interest flows from the solicitude granted marriage and family integrity by American historical tradition and is evident in various provisions of immigration law, including the federal government's derivative asylum process.  Accordingly, the Fifth Amendment vests Plaintiff with procedural due process rights that include the right to have his application for derivative asylum fairly adjudicated.  By indefinitely suspending his derivative asylum application on the basis of national origin and religious discrimination, Defendants deprived Plaintiff of his liberty interests for illegitimate reasons and without constitutionally adequate procedures.

75.     Accordingly, in issuing and implementing the Executive Order, Defendants violated the substantive and procedural due process guarantees of the Fifth Amendment.

### FIFTH CAUSE OF ACTION
### FIFTH AMENDMENT – EQUAL PROTECTION

76.     Plaintiff repeats and incorporates by reference each and every allegation contained in the previous paragraphs as if fully set forth herein.

77.     The Due Process Clause of the Fifth Amendment protects aliens living within the United States from the federal government denying equal protection of the law.

78.     Section 3(c) of the Executive Order classifies individuals and targets Plaintiff for discriminatory treatment on the basis of national origin and religion without lawful justification.

79.     The Executive Order was motivated by discriminatory animus and has a disparate impact on members of the Muslim faith.

80.     The Executive Order's discriminatory terms and application serve no compelling government interest and are not narrowly tailored.

81.     Through their actions, Defendants violate the Fifth Amendment's guarantee of equal protection.

**SIXTH CAUSE OF ACTION**
**FIRST AMENDMENT – ESTABLISHMENT CLAUSE**

82.     Plaintiff repeats and incorporates by reference each and every allegation contained in the proceeding paragraphs as if fully set forth herein.

83.     The true purpose of the Executive Order is hostility toward Islam.  The proffered secular purpose, national security, is a sham.

84.     Manifesting a purpose to favor one religion, Christianity, over another, Islam, the Executive Order violates the Establishment Clause of the First Amendment by not pursuing a course of neutrality with respect to different religious.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that judgment should be entered in favor of Plaintiff and against the Defendants as follows:

(a)     Declare that sections 3(c), 5(a)–(c), and 5(e) of the Executive Order are unlawful and unconstitutional facially and as applied to Plaintiff's pending application for derivative asylum for his wife and daughter;

(b)      Declare that Defendants are obligated to promptly and fairly adjudicate Plaintiff's petition for derivative asylum solely in accordance with preexisting law, including INA § 208(b)(3), 8 C.F.R. § 208.21, and the Constitution, and without regard to the letter or spirit of the Executive Order;

(c)      Declare that Defendants may not deny Plaintiff's wife and daughter visas nor bar their entry into the United States in violation of INA § 208(b)(3), 8 C.F.R. § 208.21, and the Constitution or in furtherance of the letter or spirit of the Executive Order;

(d)      Permanently enjoin the enforcement of Sections 3(c), 5(a)–(c), and 5(e) of the Executive Order and order that, in the event that Plaintiff's petition for asylum is granted, Defendants are obligated (i) to promptly issue immigration visas to Plaintiff's wife and daughter, and (ii) to permit them to travel to and enter the United States with those visas;

(e)      For any such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury for all issues so triable as a matter of right.

Dated: New York, New York
February 13, 2017

Respectfully submitted,

HOLWELL SHUSTER & GOLDBERG LLP

By: _____

Vincent Levy (vlevy@hsgllp.com)
Lauren Giudice (lgiudice@hsgllp.com)
Andrew Breidenbach (abreidenbach@hsgllp.com)
Andrei Vrabie (avrabie@hsgllp.com)
Matthew V.H. Noller (mnoller@hsgllp.com)
Sarah Sternlieb (ssternlieb@hsgllp.com)
Kevin Benish (kbenish@hsgllp.com) (*law clerk –
New York State Bar admission pending*)

750 Seventh Avenue, 26th Floor
New York, NY 10019
(646) 837-5151

*Attorneys for Plaintiff*