UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

JOHN DOE,

                    Plaintiff,

              -against-

DONALD J. TRUMP, as President of the United
States of America; JOHN F. KELLY, as Secretary
of the Department of Homeland Security; THE
DEPARTMENT OF HOMELAND SECURITY;
LORI SCIALABBA, as Acting Director of the U.S.
Citizenship and Immigration Services; U.S.
CITIZENSHIP AND IMMIGRATION SERVICES;
REX W. TILLERSON, as Secretary of State; U.S.
DEPARTMENT OF STATE; and THE UNITED
STATES OF AMERICA,

                  Defendants.

**Civil Action No.: 17-cv-112**

# MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND SUMMARY JUDGMENT

HOLWELL SHUSTER & GOLDBERG LLP
750 Seventh Avenue, 26th Floor
New York, NY 10019
(646) 837-5151

Dated: February 13, 2017            *Attorneys for Plaintiff*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ............................................................................... 2

ARGUMENT ..................................................................................................... 7

    I.   PLAINTIFF IS ENTITLED TO JUDGMENT AS A MATTER OF LAW .......... 8

       A.   THE EXECUTIVE ORDER VIOLATES THE INA ..................................... 8

       B.   THE EXECUTIVE ORDER UNLAWFULLY INTERFERES WITH
           PLAINTIFF'S FUNDAMENTAL RIGHT TO FAMILY INTEGRITY, IN
           VIOLATION OF DUE PROCESS ................................................................ 14

       C.   THE EXECUTIVE ORDER UNCONSTITUTIONALLY
           DISCRIMINATES ON THE BASIS OF RELIGION ................................... 19

       D.   THE EXECUTIVE ORDER UNCONSTITUTIONALLY
           DISCRIMINATES ON THE BASIS OF NATIONALITY ......................... 22

       E.   THE GOVERNMENT CANNOT JUSTIFY THE EXECUTIVE ORDER
           BASED ON SO-CALLED PRESIDENTIAL POWERS ............................. 23

    II.  THE COURT SHOULD ENTER TEMPORARY AND/OR PRELIMINARY
       INJUNCTIVE RELIEF AND EXPEDITION ON PLAINTIFF'S MOTION FOR
       SUMMARY JUDGMENT. ........................................................................ 25

CONCLUSION ................................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Ill. v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) ............................................................ 7, 25

*Andreiu v. Ashcroft,*
  253 F.3d 477 (9th Cir. 2001) .................................................................. 25

*Bhd. of Maint. of Way Emps. v. CSX Transp., Inc.,*
  478 F.3d 814 (7th Cir. 2007) .................................................................... 8

*Brokaw v. Mercer Cty.,*
  235 F.3d 1000 (7th Cir. 2000) ................................................................ 15

*Bustamante v. Mukasey,*
  531 F.3d 1059 (9th Cir. 2008) ................................................................ 17

*Church of Lukami Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993)................................................................................ 20

*City of Cleburne v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) ............................................................................... 22

*Doe ex rel. Doe v. Elmbrook School Dist.,*
  687 F.3d 840 (7th Cir. 2012) .................................................................. 20

*Elrod v. Burns,*
  427 U.S. 347 (1976)................................................................................ 25

*Ex parte Quirin,*
  317 U.S. 1 (1942)................................................................................... 23

*Exodus Refugee Immigration, Inc. v. Pence,*
  165 F. Supp. 3d 718 (S.D. Ind. 2016)..................................................... 16

*Exodus Refugee Immigration, Inc. v. Pence,*
  838 F.3d 902 (7th Cir. 2016) .......................................................... 8, 16, 22

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) .................................................................. 25

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000)................................................................................ 12

*Fiallo v. Bell,*
    430 U.S. 787 (1977)..................................................................................... 16

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.,*
    549 F.3d 1079 (7th Cir. 2008) ...................................................................... 7

*Griswold v. Connecticut,*
    381 U.S. 479 (1965)..................................................................................... 14

*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004)..................................................................................... 23

*Hillman v. Maretta,*
    133 S. Ct. 1943 (2013) .................................................................................. 9

*Jamison v. Stetson,*
    471 F. Supp. 48 (N.D.N.Y. 1978) ............................................................... 25

*Jessen v. Vill. of Lyndon Station,*
    519 F. Supp. 1183 (W.D. Wis. 1981) ......................................................... 25

*Joelner v. Vill. of Wash. Park,*
    378 F.3d 613 (7th Cir. 2004) ...................................................................... 25

*Kaufman v. McCaughtry,*
    419 F.3d 678 (7th Cir. 2005) ...................................................................... 19

*KH Outdoor, LLC v. City of Trussville,*
    458 F.3d 1261 (11th Cir. 2006) .................................................................. 26

*Kerry v. Din,*
    135 S. Ct. 2128 (2014) ................................................................................ 17

*Kleindienst v. Mandel,*
    408 U.S. 753 (1972)..................................................................................... 16

*Larson v. Valente,*
    456 U.S. 228 (1982)..................................................................................... 19

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State,*
    45 F.3d 469 (D.C. Cir. 1995) ................................................................ 8, 10

*Leiva-Perez v. Holder,*
    640 F.3d 962 (9th Cir. 2011) ...................................................................... 25

*Loughhalam v. Trump,*
    No. 17-cv-10154 (D. Mass. Feb. 3, 2017) .................................................. 18

*Loving v. Virginia*,
 388 U.S. 1 (1967) ................................................................................................ 14

*Luis v. United States*,
 136 S. Ct. 1083 (2016) ....................................................................................... 13

*Mathews v. Eldridge*,
 424 U.S. 319 (1976) ............................................................................................ 18

*McCreary Cty. v. ACLU of Ky.*,
 545 U.S. 844 (2005) ............................................................................................ 20

*Meyer v. Nebraska*,
 262 U.S. 390 (1923) ............................................................................................ 14

*Milwaukee Cty. Pavers Ass'n v. Fiedler*,
 707 F. Supp. 1016 (W.D. Wis.) .......................................................................... 25

*Moore v. City of E. Cleveland*,
 431 U.S. 494 (1977) ............................................................................................ 15

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
 413 U.S. 405 (1973) ............................................................................................ 12

*Obergefell v. Hodges*,
 135 S. Ct. 2584 (2015) ....................................................................................... 14

*Olsen v. Albright*,
 990 F. Supp. 31 (D.D.C. 1997) ............................................................................. 9

*Omar v. Kerry*,
 No. 15-CV-01760-JSC, 2015 WL 5964901 (N.D. Cal. Oct. 13, 2015) ................... 25

*Personnel Adm'r of Mass. v. Feeney*,
 442 U.S. 256 (1979) ............................................................................................ 20

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*,
 268 U.S. 510 (1925) ............................................................................................ 14

*Ping Ping Zhou v. Kane*,
 No. CV07-0785-PHX-DGC (ECV), 2007 WL 1559938 (D. Ariz. May 29, 2007) ................. 25

*Preston v. Thompson*,
 589 F.2d 300 (7th Cir. 1978) .............................................................................. 25

*Ramirez-Vicario v. Achim,*
   No. 04 C 0301, 2004 WL 392573 (N.D. Ill. Feb. 24, 2004) .................................................. 25

*Romer v. Evans,*
   517 U.S. 620 (1996) ........................................................................................................... 23

*Sampson v. Fed. Republic of Ger.,*
   250 F.3d 1145 (7th Cir. 2001) ........................................................................................... 12

*School Dist. of Abingdon Twp. v. Schemp,*
   374 U.S. 203 (1963) ..................................................................................................... 20, 21

*United States v. Salerno,*
   481 U.S. 739 (1987) ........................................................................................................... 17

*Troxel v. Granville,*
   530 U.S. 57 (2000) ............................................................................................................. 14

*United States v. U.S. Coin & Currency,*
   401 U.S. 715 (1971) ........................................................................................................... 26

*United States v. Windsor,*
   133 S. Ct. 2675 (2013) ....................................................................................................... 23

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.,*
   429 U.S. 252 (1977) ........................................................................................................... 20

*Vision Church v. Vill. of Long Grove,*
   468 F.3d 975, (7th Cir. 2006)` ........................................................................................... 19

*Washington v. Trump,*
   No. C17-0141JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017) ......................................... 6

*Washington v. Trump,*
   No. 17-35105, 2017 WL 526497 (9th Cir. Feb. 9, 2017) ............................................... *passim*

*Whitman v. Am. Trucking Ass'ns, Inc.,*
   531 U.S. 457 (2001) ........................................................................................................... 12

*Winnig v. Sellen,*
   731 F. Supp. 2d 855 (W.D. Wis. 2010) ................................................................................. 7

*Wong Wing Hang v. INS,*
   360 F.2d 715 (2d Cir. 1966) ............................................................................................... 17

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ........................................................................................................... 24

*Zablocki v. Redhail,*
  434 U.S. 374 (1978) ................................................................................................ 15

*Zemel v. Rusk,*
  381 U.S. 1 (1965) .................................................................................................... 23

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
  135 S. Ct. 2076 (2015) ....................................................................................... 8, 23

**Statutes and Regulations**

5 U.S.C. § 706(2) ...................................................................................................... 24

Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* .................................... *passim*
  8 U.S.C. § 1101(a) .................................................................................................. 12
  8 U.S.C. § 1152 ................................................................................... 8, 9, 10, 11
  8 U.S.C. § 1153 ............................................................................................ 11, 12
  8 U.S.C. § 1154 ...................................................................................................... 12
  8 U.S.C. § 1157 ...................................................................................................... 11
  8 U.S.C. § 1158 ................................................................................................ 10, 11
  8 U.S.C. § 1182(f) .................................................................................................... 8

Immigration and Nationality Act of 1952, Pub. L. 82-414, § 212(e), 66 Stat. 163 (1952) ........... 9

Immigration and Nationality Act of 1965, Pub. L. 89-236, § 2, 79 Stat. 911 (1965) .................... 9

8 C.F.R. § 208.14 ....................................................................................................... 11

8 C.F.R. § 208.21 ......................................................................................................... 3

**Other Authorities**

Executive Order 13769 ......................................................................................... *passim*

H.R. Rep. No. 89-745 (1965) ..................................................................................... 9

Pres. Proc. No. 5517 (Aug. 22, 1986) ...................................................................... 13

S. Rep. No. 89-748 (1965) ..................................................................................... 9, 12

## PRELIMINARY STATEMENT

This is an action to enjoin the unlawful immigration ban that President Trump sought to implement by executive order on January 27, 2017.  Plaintiff is a lawful resident alien who, after more than a year of thorough vetting by U.S. immigration authorities, was granted asylum status in May 2016 on account of the torture and persecution he had suffered in Syria and the risk of serious harm he faced there should he return.  He promptly filed a derivative application to secure asylum status for his wife and three-year old daughter, both of whom had been forced to stay behind in war-torn Aleppo.  Under the Immigration and Nationality Act ("INA"), approval of that application should have been a foregone conclusion.  Nevertheless, on January 27, 2017, President Trump stopped Plaintiff's derivative application in its tracks by signing the Executive Order — which, ostensibly in "the interests of the United States," indefinitely suspends the entry of all Syrians — and is thus indefinitely keeping Plaintiff apart from his wife and young child, who remain in Aleppo, hiding from warring factions who wish them both dead.

The Executive Order should promptly be set aside.  It violates the terms of the INA and frustrates Congress's purpose in passing that statute, which prohibits discrimination on the basis of national origin and was intended to secure the right of family integrity.  It also violates the Constitution of the United States in multiple respects.  By interfering with Plaintiff's fundamental right to family integrity in a manner that does not narrowly support a compelling government interest, and without adequate procedures, the Executive Order violates the Due Process Clause.  By banning nationals from a predominantly Muslim country and reflecting an invidious purpose of disfavoring Muslims, the Order violates the Equal Protection Clause and the Establishment Clause.  And by banning the entry of Syrian refugees wholesale, the Order unlawfully discriminates on the basis of nationality, in violation of the Equal Protection Clause.

1

The material facts here are not subject to reasonable dispute, and Plaintiff is entitled to summary judgment on his claims.[1]  Moreover, because he (along with his family) stands to suffer immediate and irreparable harm and the equities strongly weigh in his favor, the Court should expedite consideration of Plaintiff's motion for summary judgment and enter temporary and/or preliminary injunctive relief in the meantime.

## FACTUAL BACKGROUND[2]

### A.    Plaintiff Seeks Asylum in the United States for Himself and His Family

Plaintiff is a thirty-two-year-old Syrian man who resides in Wisconsin.  Before he came to the United States, Plaintiff, a Sunni Muslim, had faced near-certain death at the hands of two warring forces in Aleppo — the Sunni-aligned Free Syrian Army ("FSA") and the Alawite-aligned Syrian Arab Army ("SAA").  The FSA and SAA have been engaged in a six-year civil war for control of Aleppo.  In 2013, the FSA began targeting Plaintiff on the incorrect belief that Plaintiff was sympathetic to the SAA; the SAA, for its part, targeted Plaintiff because he was Sunni and owned a business in FSA-controlled territory.  FSA and SAA soldiers extorted, falsely imprisoned, tortured, and threatened to kill Plaintiff.  The SAA threatened to rape his wife.

After learning that he had been "marked for death" by the FSA and conscripted into the SAA, Plaintiff fled Syria and sought asylum in the United States in March 2014.  In April 2014 Plaintiff filed an initial Application for Asylum and for Withholding of Removal with the United States Citizenship and Immigration Services ("USCIS").  While his initial application was under

---

[1]     A party may move for summary judgment "at any time."  Fed. R. Civ. P. 56(b).

[2]     The facts set forth herein are supported by the accompanying declarations of John Doe and Andrew Breidenbach.  Once the Court grants Plaintiff leave to file under seal, Plaintiff intends to submit additional documents under seal for additional support, including his application for asylum, the order granting him asylum, and his derivative asylum application.

review, the building where his wife and children were hiding in Aleppo was hit by rocket fire.  In the ensuing panic, Plaintiff's three-year-old son fell three stories and died.  Unable to comfort his wife or mourn his son in person, Plaintiff redoubled his efforts to obtain asylum for himself and his family and filed an amended asylum application in October 2015.  In May 2016, an Immigration Judge granted Plaintiff asylum, finding that Plaintiff's return to Syria would threaten his life or freedom in violation of the U.N. Convention Against Torture.

As soon as the Immigration Judge's decision became final, Plaintiff sought asylum for his wife and daughter by filing a Refugee/Asylee Relative Petition with the USCIS.  *See* INA § 208(b)(3); 8 C.F.R. § 208.21.  Plaintiff's derivative asylum petition establishes that he is an asylee and that his wife and daughter are qualifying beneficiaries.  Derivative applications establishing these elements are routinely granted upon the U.S. government's confirmation of the identity of the derivative asylees and a background check to ensure that the derivative asylees are not threats to the United States.

These additional elements, too, will readily be met.  Plaintiff's wife does not bear hostile attitudes toward the United States, its Constitution, or its founding principles.  Neither does his daughter, who is a three-year-old child incapable of holding such views.  They have never engaged in acts of bigotry, hatred, persecution, or terror, and they have never oppressed Americans of any race, gender, or sexual orientation.  Like Plaintiff, they would be active and productive members of the Wisconsin community.  For now, though, they remain trapped in Syria, where they live in hiding to avoid death or rape at the hands of the SAA and FSA.  They lack access to basic medical care and adequate food.  And they are at imminent risk of death.

As of January 26, 2017, approval of Plaintiff's derivative asylum petition seemed like a sure thing.  USCIS's processing center in Nebraska had reviewed the petition, found it to be in

order, and forwarded it to USCIS's Milwaukee office for the security check. That too cleared, and the application was sent back to Nebraska for final processing. On January 27, 2017, however, Plaintiff's hope of family reunification fell with the stroke of a pen.

**B.      Mr. Trump Promises a Muslim Ban and Signs the Executive Order**

Before he was elected President, Donald Trump campaigned on a promise to effectuate a "complete shutdown of Muslims entering the United States." Breidenbach Decl. ¶ 2. Amid criticism, the then-candidate and his associates shifted their rhetoric, pivoting to support a ban from certain countries with "a proven history of terrorism." Breidenbach Decl. Ex. F. Yet Mr. Trump acknowledged this pivot as "an expansion" of his proposed "Muslim ban," not a rollback. *See* Breidenbach Decl. ¶ 9, Ex. H. And he repeatedly refused to distinguish between peaceful Muslims and terrorists, contending that "you don't know who is who." *See* Breidenbach Decl. ¶ 4.

Syrians, in particular, found themselves in Mr. Trump's cross-hairs during the campaign. One of Mr. Trump's campaign promises was to "stop the tremendous flow of Syrian refugees into the United States." Breidenbach Decl. ¶ 7, Ex. F. He urged citizens to "lock your doors" against Syrian refugees that had resettled in the United States. *Id.*

Mr. Trump began planning how to follow through on these invidious campaign promises even before taking office. In a television interview, Rudy Giuliani, a close advisor to Mr. Trump, explained that, after announcing his "Muslim ban," Mr. Trump "called [Mr. Giuliani] up. He said, 'Put a commission together. Show me the right way to do it legally." Breidenbach Decl. ¶ 18.

Executive Order 13769, which President Trump signed on January 27, 2017, was the result. Titled "Protecting the Nation from Foreign Terrorist Entry into the United States," the Executive Order bars from the United States the very groups of immigrants President Trump promised to

target during his campaign, including all Syrians. *See* Breidenbach Decl. Ex. N. Thus, Section 3(c) of the Executive Order categorically prohibits the entry of all aliens from seven Muslim-majority countries, including Syria, for ninety days.[3] Section 5(a) suspends the U.S. Refugee Admissions Program for all countries for 120 days, and Section 5(c) suspends the entry of Syrian refugees indefinitely. These provisions apply whether or not a Syrian seeking entry poses any threat of violence or has any connection to terrorist organizations or activities. Indeed, Section 5(c) applies to Syrians of all ages, including young children like Plaintiff's three-year-old daughter, who is plainly incapable of posing a threat to the United States.

The Executive Order also discriminates against Muslims. It directs the Secretary of State, upon resumption of refugee admissions, to "prioritize refugee claims made by individuals on the basis of religious-based persecution, *provided that the religion of the individual is a minority religion in the individual's country of nationality*." Exec. Order § 5(b) (emphasis added); *see also id.* § 5(e) (allowing for exceptions to Section 5(a) "when the person is a religious minority in his country of nationality facing religious persecution"). President Trump was frank about his intent to favor Christians over Muslims. Immediately before signing the Executive Order, President Trump (falsely) asserted that, under earlier refugee policies, "[i]f you were a Muslim you could come in [to the United States], but if you were a Christian, it was almost impossible[.] . . . And I thought it was very, very unfair. So we are going to help them." Breidenbach Decl. ¶ 14.

---

[3] Section 3(g) permits the Secretaries of State and Homeland Security to, on "case-by-case basis, and when in the national interest, issue visas or other immigration benefits to nationals of countries for which visas and benefits are otherwise blocked." The Executive Order provides no procedure or guidelines for such a request. It is also unclear how the admission of any individual alien could ever be "in the national interest."

At the signing ceremony for the Executive Order, President Trump stated that its purpose is to "establish[] new vetting measures to keep radical Islamic terrorists out of the United States of America." Breidenbach Decl. ¶ 16. He then added: "We all know what that means." Breidenbach Decl. ¶ 16, Ex. O.

## C. The Executive Order Indefinitely Separates Plaintiff from His Wife and Daughter

Absent the Executive Order, USCIS lacks a legitimate basis to deny Plaintiff's derivative asylum petition, much less to indefinitely refrain from adjudicating the petition. But with the Executive Order in place, Plaintiff's application is suspended indefinitely. Sections 3(c) and 5(a)–(c) prohibit USCIS from adjudicating Plaintiff's petition and bar the State Department from issuing visas to Plaintiff's wife and daughter as derivative asylees.

Although the District Court of the Western District of Washington in Seattle issued a temporary restraining order barring enforcement of Section 5(c), that order, which is temporary and currently on appeal, does not bar enforcement of Section 5(a), and it applies only to "United States borders and ports of entry." *Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040, at *2 (W.D. Wash. Feb. 3, 2017). As far as Plaintiff can tell, therefore, the *Washington* TRO does not prohibit application of the Executive Order in his case. Indeed, the Custom and Border Patrol website currently provides that the State Department may process visa applications only from applicants "with a passport from an unrestricted country." Breidenbach Decl. ¶ 24. Likewise, a leaked memorandum issued by Defendant Scialabba indicates that USCIS has not interpreted the temporary restraining order in *Washington* as applying to aliens outside the United States, such as Plaintiff's family. Breidenbach Decl. ¶ 23, Ex. V.

Thus, as a direct result of the Executive Order, and despite the obvious merit of Plaintiff's derivative asylum petition, Plaintiff is indefinitely — and perhaps permanently — separated from his wife and daughter, who face grave danger in Syria.

## ARGUMENT

There can be no genuine dispute of a material fact here, and Plaintiff is entitled to judgment as a matter of law because the Order is clearly unlawful for multiple reasons: (1) it exceeds the President's authority under the INA; (2) it violates Plaintiff's fundamental right to family integrity, and thus violates his substantive and procedural due process rights; (3) it discriminates against Plaintiff on the basis of religion, in violation of the Establishment Clause and the Fifth Amendment's guarantee of equal protection; and (4) it discriminates against Plaintiff on the basis of national origin, also in violation of equal protection.

Moreover, because Plaintiff will suffer irreparable harm if the Order is not enjoined immediately, he is entitled to a temporary restraining order and/or a preliminary injunction, as well as expedited consideration of his summary-judgment motion. To obtain temporary or preliminary injunctive relief, the moving party must demonstrate (1) "some likelihood of success on the merits," (2) no adequate remedy at law, (3) irreparable harm in the absence of the injunction, and (4) a balance of the equities in his favor. *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012).[4] The "more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (internal quotation marks omitted). Numerous courts have

---

[4]     The standards for a temporary restraining order and a preliminary injunction are the same. *Winnig v. Sellen*, 731 F. Supp. 2d 855, 856 (W.D. Wis. 2010).

entered temporary restraining orders in cases challenging the Executive Order; this Court should do the same.

## I.   PLAINTIFF IS ENTITLED TO JUDGMENT AS A MATTER OF LAW

### A.   THE EXECUTIVE ORDER VIOLATES THE INA

In issuing the Executive Order, the President expressly invoked his authority under Section 212(f) of the INA, 8 U.S.C. § 1182(f).[5] But Section 212(f) does not authorize the President to suspend the refugee program or to indefinitely suspend entry of all Syrians, as the text and structure of the INA make apparent. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2090 (2015) ("The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue.").

**1.** To begin with, by prohibiting entry of all Syrians, the Executive Order violates Section 202(a)(1)(A) of the INA, w:

> Except as specifically provided in paragraph (2) and in sections 1101(a)(27), 1151(b)(2)(A)(i), and 1153 of this title, no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence.

8 U.S.C. § 1152(a)(1)(A). This section "unambiguously direct[s] that no nationality-based discrimination shall occur." *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 473 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996). The Executive Order plainly contravenes that mandate because, as the Seventh Circuit recently held, "targeting

---

[5] Section 212(f) provides, in relevant part: "Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."

Syrian refugees is discrimination on the basis of nationality." *Exodus Refugee Immigration, Inc.
v. Pence*, 838 F.3d 902, 905 (7th Cir. 2016).

Nor does Section 212(f) exempt the President from Section 202(a)(1)(A)'s
antidiscrimination rule. It is indeed well established that "[a] specific statute takes precedence
over a more general statute, and a later enacted statute may limit the scope of an earlier statute."
*Bhd. of Maint. of Way Emps. v. CSX Transp., Inc.*, 478 F.3d 814, 817 (7th Cir. 2007). That is the
case here; Section 202(a)(1)(A) was enacted in 1965, thirteen years after Section 212(f). *See*
INA of 1965, Pub. L. 89-236, § 2, 79 Stat. 911, 911 (1965); INA of 1952, Pub. L. 82-414,
§ 212(e), 66 Stat. 163, 188 (1952). And Section 202(a)(1)(A) by its plain terms applies "[e]xcept
as specifically provided" in four identified provisions of the INA — none of which is Section
212(f). 8 U.S.C. § 1152(a)(1)(A). Where, as here, "Congress explicitly enumerates certain
exceptions to a general prohibition, additional exceptions are not to be implied." *Hillman v.
Maretta*, 133 S. Ct. 1943, 1953 (2013) (internal quotation marks omitted). Because Section
202(a)(1)(A)'s antidiscrimination mandate does not include Section 212(f) in its list of
exceptions, it limits the President's authority under Section 212(f).

Section 202(a)(1)(A)'s legislative history confirms the point. Before 1965, U.S.
immigration was governed by the "national origins system." H.R. Rep. No. 89-745, at 8 (1965)
(Breidenbach Decl. Ex. Y). Designed "to maintain the ethnic balance of the American
population as it existed in 1920," the national origins system created immigration quotas "based
upon race and place of birth." *Id.* at 10. By 1965, however, it was clear that the national origins
system, which "impl[ied] that men and women from some countries are, just because of where
they come from, more desirable citizens than others," was "incompatible with our basic
American tradition." *Id.* at 11. In 1965, Congress thus passed the INA, the "primary objective"

9

of which was to "abolish[] . . . the national origins quota system" and replace it with "a new system of selection." S. Rep. No. 89-748, at 11, 13 (1965) (Breidenbach Decl. Ex. Z); *see* H.R. Rep. No. 89-745, at 18. This new system, "designed to be fair, rational, humane, and in the national interest," would select immigrants "without regard to place of birth." H.R. Rep. No. 89-745, at 12; *see* S. Rep. No. 89-748, at 13–14.

Section 202(a)(1)(A) was central to achieving the 1965 Act's antidiscrimination goals. *See Olsen v. Albright*, 990 F. Supp. 31, 37 (D.D.C. 1997). By "flatly forbidding nationality-based discrimination," *Vietnamese Asylum Seekers*, 45 F.3d at 473, Section 202(a)(1)(A) ensured that the United States would never again close its borders to immigrants based solely on nationality. As President Johnson put it in a signing ceremony before the Statue of Liberty, "for over four decades the immigration policy of the United States ha[d] been twisted and . . . distorted by the harsh injustice of the national origins quota system." The 1965 Act corrected this "cruel and enduring wrong in the conduct of the American Nation." Breidenbach Decl. Ex. AA. In contravention of Congress's mandate, President Trump has sought to repeat what President Johnson coined a "harsh injustice."

**2.** Next, although it is not clear that Section 5(a)'s suspension of the *entire* "U.S. Refugee Admissions Program (USRAP) for 120 days" applies to Plaintiff's derivative asylum application,[6] what is clear is that this provision also contravenes the statutes enacted by Congress. Section 212(f), which governs the "entry" of aliens, does not empower the President to unilaterally suspend the adjudication of asylum applications or otherwise to suspend USRAP,

---

[6]     Indeed, given that Plaintiff is applying for *derivative* asylum — meaning that his wife and daughter do not need to demonstrate that they themselves are eligible for asylum in their own right — it is not clear that the suspension of refugee applications governs at all.

and it is telling that Section 5(a), unlike Section 5(c), does not even cite Section 212(f) — or, for that matter, any other statute — in purporting to suspend USRAP.  Perhaps that is because Congress did not provide the President that authority.

Instead, Congress required "final administrative adjudication" of asylum applications to "be completed within 180 days after the date an application is filed."  8 U.S.C. § 1158(d)(5)(A)(iii).  To add other "conditions or limitations," the Attorney General — not the President — must promulgate regulations (following notice and comment) that are "not inconsistent" with the INA.  *Id.* § 1158(d)(5)(B).  Section 5(a) of the Executive Order, which was issued by the President, is not a regulation promulgated following notice and comment, and it is inconsistent with the INA.  Indeed, it is even inconsistent with the regulations that the Government has promulgated following notice and comment, including the prescription that the adjudication of any individual asylum application shall be vested to the discretion of "an asylum officer," not the President.  8 C.F.R. § 208.14.  Section 5(a) of the Executive Order is therefore unlawful.

**3.**  More generally, the President's reading of Section 212(f) to permit him to suspend all refugee applications and to suspend entry of all Syrians is plainly inconsistent with the statutory scheme, which carefully regulates immigration and refugee applications consistent with Congress's policy judgments.  Congress's guarantee of fairness and equality in matters of immigration would be a dead letter if Section 212(f) permitted the President to override the carefully calibrated legislative scheme on the mere invocation of the "national interest."  More than that, the Government's interpretation of Section 212(f) would allow the President to single-handedly dismantle the entire body of immigration and refugee law that Congress created.

Particularly relevant here is Congress's decision in the INA to impose precise requirements, procedures, quotas, and priorities for immigrant visas, *see* 8 U.S.C. §§ 1152–53, and refugee admissions, *id.* §§ 1157–58. If the President wishes to alter the number of refugees the United States will accept, he may do so only after "appropriate consultation" with Congress — a statutory term defined to mean meeting "with members of the Committees on the Judiciary of the Senate and of the House of Representatives to review the refugee situation" and "to discuss" certain matters specified by statute. *Id.* §§ 1157(a)(2), (b), (e). Similarly, the INA includes a number of provisions designed to favor family reunification in the application and processing of immigration matters. *See id.* §§ 1101(a)(27), 1153(a)–(e), 1154(a); S. Rep. No. 89-748, at 13 ("Reunification of families is to be the foremost consideration."). These provisions reflect not just a considered judgment by Congress to support family relations, but also a decision to adhere to the international legal obligations of the United States. *See* DHS, Annual Flow Report, Refugees and Asylees: 2005 (Breidenbach Decl. ¶ 29, Ex. BB) ("U.S. asylum policy is governed by the Refugee Act of 1980. The Refugee Act established a statutory process for granting asylum consistent with the 1951 Convention Relating to the Status of Refugees.").[7]

Congress could not have intended these and countless other detailed provisions — including, notably, provisions that prohibit discrimination on the basis of nationality and protect the right to family integrity — to be mere suggestions that the President could override by

---

[7]     *See* Final Act of the 1951 U.N. Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, Recommendation B (Breidenbach Decl. ¶ 30, Ex. CC) (declaring that "the unity of the family . . . is an essential right of the refugee" and calling upon governments to "take the necessary measures for the protection of the refugee's family"); *see also Sampson v. Fed. Republic of Ger.*, 250 F.3d 1145, 1151 (7th Cir. 2001) ("'[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains[.]'" (quoting *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804))).

unreviewable executive fiat, on the simple proclamation that the "national interest" is different than what Congress had declared in a federal statute. As Justice Scalia colorfully explained for a unanimous Supreme Court, Congress does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001), or time-bombs in carefully designed legislative schemes. *See also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000) (holding Congress did not intend to permit the FDA to regulate tobacco by granting it the authority to regulate "drugs"). The INA should not be "interpret[ed] … to negate [its] own stated purposes." *N.Y. State Dep't of Soc. Servs. v. Dublino,* 413 U.S. 405, 419–20 (1973).

Presidents have never before understood their authority under Section 212(f) to be unlimited in the way the Government now claims. In the long history of presidential proclamations based on section 212(f), not one has categorically excluded all aliens from a particular nation — until now. *See* Breidenbach Decl. ¶ 11, Ex. J at 6–10; *see also* Breidenbach Decl. ¶ 9, Ex. X.[8] The "lack of historical precedent" for the Executive Order is a "telling indication" that it is unlawful. *Luis v. United States*, 136 S. Ct. 1083, 1099 (2016) (internal quotation mark omitted). The Executive Order — insofar as it puts on hold the entire refugee application process and indefinitely disallows Syrians entry into the United States — should be set aside as inconsistent with the INA. Defendants should be ordered to consider Plaintiff's derivative application consistent with the INA.

---

[8] President Reagan did issue a proclamation excluding many Cuban nationals, but that proclamation did not categorically exclude Cubans as immigrants and did not exclude them as nonimmigrants at all. Pres. Proc. No. 5517 (Aug. 22, 1986). It was also a direct response to Cuba's suspension of immigration between Cuba and the United States. *Id.* It thus provides no support for the Executive Order, which categorically excludes aliens from seven different nations as immigrants and nonimmigrants based on nothing more than a generalized and unsupported assertion of risk.

**B.    THE EXECUTIVE ORDER UNLAWFULLY INTERFERES WITH PLAINTIFF'S FUNDAMENTAL RIGHT TO FAMILY INTEGRITY, IN VIOLATION OF DUE PROCESS**

Even if the Executive Order could be justified on statutory grounds as a valid exercise of authority under the INA, it would still be unlawful because, in suspending Plaintiff's derivative application and barring entry of Syrians, it violates the Fifth Amendment's guarantee of due process.  The Executive Order indeed violates both substantive and procedural due process because it unfairly deprives Plaintiff of the fundamental right of family integrity, recognized by the Supreme Court and the Seventh Circuit in a number of cases, and does so without adequate justification or procedures.

1.    As the Supreme Court long ago explained, the Fifth Amendment's protection from deprivations of liberty without due process protects "not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men."  *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

Consistent with that instruction, the Supreme Court has since explained that the Due Process Clause protects against unwarranted governmental interference with numerous aspects of the marital relationship.  *See Griswold v. Connecticut*, 381 U.S. 479, 485–86 (1965) (right of married couples to contraception); *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (right to marry); *Obergefell v. Hodges*, 135 S. Ct. 2584, 2599 (2015) (right to same-sex marriage).  It also protects against interferences with the right to rear children: "[T]he right of parents to 'establish a home and bring up children' and 'to control the education of their own'" is "perhaps the oldest of the

14

fundamental liberty interests recognized by th[e] [Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see Meyer*, 262 U.S. at 402–03 (recognizing right of parents to have their child learn the German language); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925) (recognizing fundamental right "of parents and guardians to direct the upbringing and education of children under their control").

These cases and others establish that the Due Process Clause provides heightened protection against government interference with the integrity of the unitary family. Government conduct that interferes with this fundamental right must be narrowly tailored to further a compelling government interest. *E.g.*, *Zablocki v. Redhail*, 434 U.S. 374, 368 (1978); *Moore v. City of E. Cleveland*, 431 U.S. 494, 500 (1977); *see also Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1018–19 (7th Cir. 2000) (collecting cases recognizing the "constitutional right to familial relations").

**2.** The Executive Order undoubtedly contravenes the prohibition against unwarranted governmental interferences with the "constitutional right to familial relations." *Brokaw*, 235 F.3d at 1018. It interferes with Plaintiff's fundamental right to family integrity by making it impossible for him to reunite with his wife and young child. It suspends the derivative asylum process — enacted by Congress to spare asylees the choice between further persecution or family disintegration — and indefinitely bars all means of entry to his wife and child. Moreover, Plaintiff cannot return to them without facing further torture and likely death, as the Government found in granting him asylum. To interfere with Plaintiff's fundamental right of family integrity, therefore, the Executive Order must be narrowly tailored to advance a compelling state interest. *See, e.g.*, *Zablocki*, 434 U.S. at 368.

But the Executive Order flunks that test because it is both over- *and* under-inclusive with respect to its purported justification of protecting against the entry of terrorists. The Executive Order is overbroad because it ensnares immigrants with no possible connection to terrorism. Plaintiff's daughter is a case in point: the Executive Order here serves only to protect America from the non-existent threat of a sick three-year-old girl entering the country to be reunited with her father. Simply put, "[i]t is beyond reasonable argument to contend that a policy that purportedly deters [Syrian] four year olds from resettling . . . is narrowly tailored to serve the . . . asserted interest in public safety." *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 737 (S.D. Ind.), *aff'd*, 838 F.3d 902 (7th Cir. 2016).

The Executive Order is also drastically under-inclusive. As the Seventh Circuit explained recently in *Pence*, "no Syrian refugees have been arrested or prosecuted for terrorist acts or attempts in the United States." *Pence*, 838 F.3d at 904. Nor have any fatal terrorist attacks been committed in the United States by a national of any of the seven countries covered by Section 3(c) in at least the past quarter century. *See* Breidenbach Decl. ¶¶ 12, 20, Exs. K, S. Conversely, nationals from other countries *not* subject to the Executive Order have perpetrated fatal attacks in the United States in the last two decades. *Id.* None of the perpetrators of the September 11th, Boston Marathon, San Bernardino, or Orlando attacks came from Syria or any of the other six affected countries.

The Government has argued in other cases challenging the Executive Order that its conduct must only be "facially legitimate and bona fide" where immigration is at stake, even where the action interferes with a plaintiff's fundamental rights. *Fiallo v. Bell*, 430 U.S. 787, 807 (1977); *Kleindienst v. Mandel,* 408 U.S. 753, 770 (1972). But, as the Ninth Circuit recently held in rejecting this argument, that more limited standard of review applies only to "lawsuits

challenging an executive branch official's decision to issue or deny an individual visa based on the application of a congressionally enumerated standard to the particular facts presented by that visa application," not to all executive exercises of immigration authority. *Washington v. Trump*, No. 17-35105, 2017 WL 526497, at *6 (9th Cir. Feb. 9, 2017); *see also Fiallo*, 430 U.S. at 797–98 (challenging statutory scheme setting out special preference immigration status to aliens who qualify as the "children" or "parents" of United States citizens or lawful permanent residents). *Mandel*'s deferential standard of review, tailored to Executive actions taken in reliance on pre-existing law, is ill-equipped to account for the myriad interests implicated by the sweeping, unprecedented Executive Order. *Trump*, 2017 WL 526497, at *6.[9] *Mandel* provides no basis to override nearly a century of cases protecting the rights of persons in the United States from unwarranted incursions into the familial unit.

**3.** The Executive Order also violates the Due Process Clause because it deprives Plaintiff of adequate procedures. *See United States v. Salerno*, 481 U.S. 739, 746 (1987) ("When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner." (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976))). Plaintiff's procedural due process right in his derivative asylum application is directly implicated by its deprivation of an important, fundamental liberty interest — family integrity. *Cf. Bustamante v. Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008) (joining

---

[9]     In any event, the Executive Order cannot pass muster even under the *Mandel* test. "[P]rotecting the nation from foreign terrorist entry" is a facially legitimate reason to exclude certain classes of aliens. But there is overwhelming evidence that the real reason for the Executive Order is anti-Muslim animus. *See infra* at 20–21. Therefore, Defendants' asserted justification for the Executive Order is not *bona fide* and cannot stand. *See Wong Wing Hang v. INS*, 360 F.2d 715, 719 (2d Cir. 1966) (Friendly, J.) (executive immigration decisions cannot rest on "invidious discrimination against a particular race or group").

the First, Second, and D.C. Circuits to hold that a U.S. citizen raising a constitutional challenge to the denial of a visa to her husband is entitled to a limited judicial inquiry regarding the reason for the decision).[10]

There are three general factors that courts weigh to determine whether the process at issue is constitutional: (1) the private interest affected by the official actions; (2) the risk of an erroneous deprivation of the interest and the value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the fiscal and administrative burdens the additional or substitute procedural requirements would impose. *Eldridge*, 424 U.S. at 335.[11] Whatever process is due here, the Executive Order does not provide it — it provides no process at all, as the Ninth Circuit recently observed in denying the Government's motion for a temporary stay. *See Trump*, 2017 WL 526497, at *7 ("[T]he Government does not contend that the Order provides for such process."). Accordingly, the Executive Order, as applied to Plaintiff's pending application for derivative asylum, violates Plaintiff's procedural due process rights.

---

[10]     Four members of the Supreme Court recently agreed with this rule in *Kerry v. Din*, 135 S. Ct. 2128, 2142 (2015) (Breyer, J., dissenting). In *Din*, Justices Kennedy and Alito found it unnecessary to decide whether there was such a right because they believed the government had granted adequate process under the circumstances of the case.

[11]     Defendants have never explained why existing procedures are inadequate to consider pending derivative asylum applications. Refugees are subject to "the highest level of background and security checks of any category of traveler to the United States," in a process that often takes years to complete, and Syrian applicants are subject to "enhanced review." Breidenbach Decl. ¶ 31, Ex. DD. Indeed, the Executive Order is likely to undermine U.S. national security interests. *See* Breidenbach Decl. ¶ 25, Ex. X (Joint Declaration of Madeleine K. Albright et al., *Trump*, No. 17-35105, ECF No. 28-2 (detailing how the Executive Order will endanger U.S. troops and intelligence sources; disrupt key counterterrorism, foreign policy, and national-security partnerships; and "feed the recruitment narrative of ISIL and other extremists that portray the United States as at war with Islam").

## C. THE EXECUTIVE ORDER UNCONSTITUTIONALLY DISCRIMINATES ON THE BASIS OF RELIGION

The Executive Order also violates the Establishment Clause and the Fifth Amendment's guarantee of Equal Protection because it does what it was intended to do — disfavor Islam at the expense of other religions.[12] The Establishment Clause's "clearest command" is that "one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). "This prohibition is absolute." *Id.* at 246. The Constitution's equal protection guarantee likewise prohibits the government from discriminating based on religion. *See Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006). The Executive Order violates both of these Constitutional proscriptions; it should be set aside in its entirety because the religious message taints the entire Order.

**1.** The Executive Order facially discriminates based on religion. The fact that the Executive Order does not mention any religion by name is of no moment. In *Larson*, the Supreme Court struck down a tax provision that did not explicitly prefer any particular religion because the effect of the law was to favor well-established religious groups over new religious groups. 456 U.S. at 231–32, 246 n.23. The Executive Order should likewise be struck down. Sections 5(b) and 5(e) of the Executive Order expressly prioritize members of the "minority religion in the individual's country of nationality." Because these provisions are not neutral with respect to religion, they violate the Establishment Clause. *See Larson*, 456 U.S. at 254 (government may not impose "burdens . . . upon particular denominations"); *Kaufman v.*

---

[12]     Plaintiff's Establishment Clause claim is materially distinct from the claim found unlikely to succeed for lack of standing in *Loughhalam v. Trump*, No. 17-cv-10154 (D. Mass. Feb. 3, 2017). Unlike the *Loughhalam* plaintiffs, Plaintiff is already in the United States and is seeking admission for his family; the Executive Order thus directly affects his right to live with his wife and daughter. Plaintiff plainly has standing to enforce his own constitutional rights.

*McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005) (government may not "favor[] one religion over another").[13]

**2.** Even if the Executive Order passed muster facially, it should still be set aside. A facially neutral law violates the Establishment Clause when it "(1) lacks a legitimate secular purpose; (2) has the primary effect of advancing or inhibiting religion; or (3) fosters an excessive entanglement with religion." *Doe ex rel. Doe v. Elmbrook School Dist.*, 687 F.3d 840, 849 (7th Cir. 2012) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971)); *see also School Dist. of Abingdon Twp. v. Schemp*, 374 U.S. 203, 222 (1963) ("The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution."). Similarly, under the Equal Protection Clause, a facially neutral law that has a "disproportionately adverse effect" on a suspect classification, including a religious denomination, violates equal protection if the "impact can be traced to a discriminatory purpose." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979).

In performing these analyses, the Court may consider "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Church of Lukami Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993). When "openly available data supported a commonsense conclusion that a religious objective permeated the government's action," the action is

---

[13]     In fact, as President Trump made clear, the Executive Order was intended specifically to favor Christianity at the expense of Islam. *See* Breidenbach Decl. ¶ 14 ("[W]e are going to help [Christians].").

unconstitutional. *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 863 (2005); *see also Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265–66 (1977) ("When there is a proof that a discriminatory purpose has been a motivating factor in the decision, … judicial deference [to the political process] is no longer justified.").

Here, the Executive Order's purpose to discriminate against Muslims is not hidden; it is open and notorious. As a candidate, Mr. Trump expressed hostility toward Muslims and pledged — publicly, loudly, and repeatedly — to ban them from entering the United States. *See* Breidenbach Decl. ¶¶ 2–8; *Trump*, 2017 WL 526497, at *10 (per curiam) (citing "numerous statements by the President about his intent to implement a 'Muslim ban' as well as evidence . . . that the Executive Order was intended to be that ban"). Now that he is President, he is attempting to live up to that promise in a way that permits him to tell his supporters that he is banning Muslims from the United States while assuring the courts that he is not. But a vast swath of our nation, and indeed the world, understands the Executive Order for precisely what it is — as President Trump coyly acknowledged, "[w]e all know what [it] means."

Yes, we do: it reflects an "official" policy "inhibiti[ng] [one] religion," Islam. *Schemp*, 374 U.S. at 222. "This the Establishment Clause prohibits." *Id.*[14]

---

[14]     The Executive Order also excessively entangles the government with religion. The Executive Order provides no guidelines for assessing what constitutes a minority religion and whether minority sects of a particular religion constitute a minority religion. For example, the majority of Syrians are Sunni Muslims. Would the Department of Homeland Security consider a Shi'ite Syrian to be a religious minority? And how would it determine a non-citizen's religion in the first place: Public attendance of religious ceremonies? The honor system? A pop quiz? The unending questions associated with enforcement of the Executive Order make it clear that there is no justification for a governmental preference against Islam on such a wide scale.

**D.   THE EXECUTIVE ORDER UNCONSTITUTIONALLY DISCRIMINATES ON THE BASIS OF NATIONALITY**

When confronted with the fact that a religion-based "Muslim ban" is unconstitutional, then-candidate Trump tried to pivot by characterizing his proposal as a ban that discriminates on the basis of "territory" or national origin, responding flippantly: "So you call it territories, ok? We're gonna do territories.  We're gonna not let people come in from Syria."  Breidenbach Decl. ¶ EE.  Even looking past the fact that this was a change in name only, and is certainly not bona fide, this pivot from religion to nationality did nothing to alter the policy's unconstitutionality. Indeed, classifications based on national origin are also inherently suspect and subject to strict scrutiny under the Fifth Amendment.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

There can be no question that the Executive Order is facially discriminatory on the basis of national origin.  The Executive Order indefinitely bans entry of refugees from just one country: Syria.  Exec. Order § 5(c).  It further denies all entry for non-citizens from Syria and six other identified countries.  *Id.* § 3(c).  As the Seventh Circuit recently recognized in invalidating then-Governor (now-Vice President) Pence's denial of federal resettlement funds for Syrian refugees, such distinctions are illegal "discrimination on the basis of nationality."  *Pence*, 838 F.3d at 904.  Writing for the Court of Appeals, Judge Posner did not mince words:

> [In defending the order, Pence] argues that his policy of excluding Syrian refugees is based not on nationality and thus is not discriminatory, but is based solely on the threat he thinks they pose to the safety of residents of Indiana. But that's the equivalent of his saying (not that he does say) that he wants to forbid black people to settle in Indiana not because they're black but because he's afraid of them, and since race is therefore not his motive he isn't discriminating. But that of course would be racial discrimination, just as his targeting Syrian refugees is discrimination on the basis of nationality.

*Id.* at 904–05.

Because the Executive Order, in prohibiting entry of Syrian refugees, discriminates on the basis of national origin, it must satisfy strict scrutiny. But defendants can offer no compelling government interest to justify such blatant discrimination. Even if the Court were to accept the Executive Order's purported national-security justification — and, under the Seventh Circuit's decision in *Pence*, the Court could not — the Executive Order is, as previously explained, not narrowly tailored to advance that interest. It is both over- and under-inclusive, depriving all sorts of persons from entry into the United States regardless of their relationship to terrorism, such as Plaintiff's wife and three-year-old daughter. *See supra* at 15–16.

Moreover, even a lesser level of scrutiny would not change this conclusion. "The Constitution's guarantee of equality 'must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534–35 (1973)). The "sheer breadth" of the Executive Order — barring all Syrians indefinitely — is "so discontinuous with the reasons offered for it" — protecting the nation from terrorist entry — "that [it] seems inexplicable by anything but animus toward the class it affects." *Romer v. Evans*, 517 U.S. 620, 632 (1996). The Executive Order thus lacks even "a rational relationship to legitimate state interests." *Id.*

## E. THE GOVERNMENT CANNOT JUSTIFY THE EXECUTIVE ORDER BASED ON SO-CALLED PRESIDENTIAL POWERS

In other cases challenging the Executive Order, the Government has taken the position that the Executive Order, however unlawful or unconstitutional it might be in other contexts, is nevertheless a valid — and unreviewable — exercise of the President's power over foreign

affairs.  Not so.  To be sure, the President receives a large degree of deference on matters concerning immigration and national security.

But the law does not permit the President to suspend constitutional or statutory mandates, even when immigration and national security are at issue.  *See, e.g.*, *Zemel v. Rusk*, 381 U.S. 1, 17 (1965); *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (plurality opinion).  The Judiciary has a duty, "in time of war as well as in time of peace, to preserve unimpaired the constitutional safeguards of civil liberty."  *Ex parte Quirin*, 317 U.S. 1, 19 (1942).  Congress's statutory mandates, too, limit the authority of the President, and again, they do so even in the immigration and national-security context.  *See Zivotofsky*, 135 S. Ct. at 2090 ("The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582–83 (1952) (holding the President may not seize the nation's steel mills merely by proclamation, even upon finding that such a seizure "was necessary to avert a national catastrophe which would inevitably result from a stoppage of steel production," and even where steel was "indispensab[le] . . . as a component of substantially all weapons and other war materials" necessary for the United States in an ongoing war).

*      *      *

For the foregoing reasons, Plaintiff is entitled to judgment as a matter of law.  The material facts are not and cannot be the subject of reasonable dispute.  The Executive Order is unlawful and unconstitutional.  It far exceeds the President's authority under Section 212(f) of the INA.  And, contrary to both statutory and constitutional law, it discriminates on the basis of religion and nationality and interferes with Plaintiff's fundamental right of family integrity without narrowly furthering a compelling government interest.  Moreover, for all the above

reasons, agency enforcement of the Executive Order is unlawful under the Administrative Procedures Act. 5 U.S.C. § 706(2)(A)–(C). The Court should enter summary judgment in Plaintiff's favor.

II.     **THE COURT SHOULD ENTER TEMPORARY AND/OR PRELIMINARY INJUNCTIVE RELIEF AND EXPEDITION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT.**

Given Plaintiff's showing on the merits, the immediate threat to himself and to his wife and young child, and the balance of the equities, the Court should not just enter a permanent injunction at the conclusion of briefing. It should also immediately enter a temporary restraining order or preliminary injunction to preserve the status quo that existed before the President signed the Executive Order, just as countless other courts have done in cases challenging the Order.

**1.** As a general matter, the mere establishment of a constitutional violation of the sort at issue here establishes both irreparable injury and that the balance of the equities supports entry of an injunction. Indeed, constitutional violations are presumed to result in irreparable harm. *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).[15] Similarly, it is "always in the public interest" to enjoin unconstitutional conduct. *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004) (internal quotation marks omitted). "[T]he public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Alvarez*, 679 F.3d at 590; *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) (stating that remedying a "continuing constitutional violation . . . certainly would serve the public interest").

---

[15]     *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (First Amendment); *Preston v. Thompson*, 589 F.2d 300, 303 (7th Cir. 1978); *Milwaukee Cty. Pavers Ass'n v. Fiedler*, 707 F. Supp. 1016, 1032 (W.D. Wis.), *modified*, 710 F. Supp. 1532 (W.D. Wis. 1989) (equal protection); *Jessen v. Vill. of Lyndon Station*, 519 F. Supp. 1183, 1189 (W.D. Wis. 1981) (equal protection, due process, and First Amendment).

Given Plaintiff's strong showing on the merits, the Court should enter immediate relief now to preserve the status quo, and it should expedite consideration of the merits of Plaintiff's action.

**2.** But this case presents a particularly pronounced showing that immediate injunctive relief is warranted. Indeed, as courts in this and other Circuits have recognized, separation from one's wife and child constitutes irreparable harm.[16] Plaintiff has not seen his wife in three years. He has not experienced any of the crucial "firsts" in his daughter's life: her first smile, her first steps, her first words. He could not be with his family to bury and mourn his son; he must grieve alone. And while Plaintiff's derivative asylum application is suspended, Aleppo remains a humanitarian disaster. Its residents, including Plaintiff's family, lack access to adequate food, shelter, and other basic services. Plaintiff's daughter is ill without access to basic medical care. The SAA, whose members threatened to rape Plaintiff's wife, is still active and in control of the neighborhood where she remains in hiding, too terrified to risk going outside absent an emergency. As long as the Executive Order is in effect, Plaintiff will live every day not knowing if he will ever see his family again. His injury is not subject to serious dispute.

For the same reasons, the balance of equities strongly favors the entry of immediate relief today. It is not hyperbole to say that such relief is a matter of life and death. By contrast, Defendants have no cognizable interest in continuing to implement an Executive Order that violates both federal law and the United States Constitution. *See United States v. U.S. Coin & Currency*, 401 U.S. 715, 726 (1971); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272

---

[16] *E.g.*, *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011); *Andreiu v. Ashcroft*, 253 F.3d 477, 484 (9th Cir. 2001) (en banc); *Ramirez-Vicario v. Achim*, No. 04 C 0301, 2004 WL 392573, at *3 (N.D. Ill. Feb. 24, 2004); *Omar v. Kerry*, No. 15-CV-01760-JSC, 2015 WL 5964901, at *9 (N.D. Cal. Oct. 13, 2015); *Ping Ping Zhou v. Kane*, No. CV 07-0785-PHX-DGC (ECV), 2007 WL 1559938, at *4 (D. Ariz. May 29, 2007).

(11th Cir. 2006). Nor does Defendants' pretextual "national security" interest outweigh Plaintiff's interests, given the Executive Order's failure to advance that purported interest in a tailored way. *See supra* at 15–16; *Trump*, 2017 WL 526497, at \*10 (finding no harm to Government from stay of Executive Order because there is "no evidence that any alien from any of the countries named in the Order has perpetrated a terrorist attack in the United States").

## CONCLUSION

Plaintiff respectfully asks this Court to enter summary judgment in his favor. In the meantime, or in the alternative, the Court should enter a temporary restraining order and a preliminary injunction, blocking enforcement of Sections 3(c), 5(a)–(c), and 5(e) of the Executive Order and ordering Defendants to finish processing Plaintiff's derivative asylum petition.

Dated: New York, New York
      February 13, 2017

Respectfully submitted,

HOLWELL SHUSTER & GOLDBERG LLP

By: _____/s/ Vincent Levy_____
    Vincent Levy (vlevy@hsgllp.com)
    Lauren Giudice (lgiudice@hsgllp.com)
    Andrew Breidenbach (abreidenbach@hsgllp.com)
    Andrei Vrabie (avrabie@hsgllp.com)
    Matthew V.H. Noller (mnoller@hsgllp.com)
    Sarah Sternlieb (ssternlieb@hsgllp.com)
    Kevin Benish (kbenish@hsgllp.com) (*law clerk – New York State Bar admission pending*)

750 Seventh Avenue, 26th Floor
New York, NY 10019
(646) 837-5151

*Attorneys for Plaintiff*