UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

JOHN DOE,

                                 Plaintiff,

                     -against-

DONALD J. TRUMP, as President of the United
States of America; JOHN F. KELLY, as Secretary
of the Department of Homeland Security; THE
DEPARTMENT OF HOMELAND SECURITY;
LORI SCIALABBA, as Acting Director of the
U.S. Citizenship and Immigration Services;
U.S. CITIZENSHIP AND IMMIGRATION
SERVICES; REX W. TILLERSON, as Secretary
of State; U.S. DEPARTMENT OF STATE; and
THE UNITED STATES OF AMERICA,

                          Defendants.

**Civil Action No.: 17-cv-112**

Chief Judge William M. Conley

**<u>AMENDED COMPLAINT</u>**

JURY TRIAL DEMANDED

## <u>INTRODUCTION</u>

1.     Plaintiff is a Sunni Muslim who, after being fully vetted by U.S. immigration authorities, was granted asylum status because of the torture and religious persecution he had suffered in Syria.  He thereafter filed derivative asylum petitions to reunite with his wife and his only surviving child, a three-year-old daughter he has not seen since March 2014, who remain in war-torn Syria.

2.     President Trump's efforts to impose an immigration ban by executive order are threatening to stop Plaintiff's derivative asylum petitions in their tracks.  On January 27, 2017, President Trump signed an executive order, "Protecting the Nation from Foreign Terrorist Entry into the United States," which suspended entry of Syrian nationals into the United States.  As the Government has acknowledged in this Court, it thereafter stopped processing derivative asylum

petitions.  The Government resumed processing those petitions after numerous federal courts enjoined enforcement of provisions of the President's first executive order.

3.     On March 6, 2017, President Trump issued an identically-titled second executive order (the "Executive Order"), which is scheduled to go into effect on March 16, 2017, and will again suspend entry of Syrian nationals into the United States.  The Executive Order, like its predecessor, effectuates President Trump's long-standing campaign promise of implementing a "total and complete shutdown of Muslims entering the United States."  It also unlawfully and unconstitutionally prevents Plaintiff from reuniting with his wife and young daughter, and this Court should set it aside.

## PARTIES

4.     Plaintiff John Doe was granted asylum status in May 2016 and, eight months later, filed derivative asylum petitions for his wife and daughter.  These petitions are pending.  Plaintiff resides in the Western District of Wisconsin.  With the Court's leave, he is proceeding anonymously to protect his wife and daughter from harm that they stand to suffer in Aleppo, where they currently reside, should Plaintiff's identity be revealed.

5.     Defendant Donald J. Trump is President of the United States.  President Trump signed the Executive Orders that are the subject of this action.  He is sued in his official capacity.

6.     Defendant John F. Kelly is the Secretary of the Department of Homeland Security. Defendant Kelly is responsible for implementing the Immigration and Nationality Act ("INA") and the Executive Orders that are the subject of this action.  He is sued in his official capacity.

7.     Defendant Department of Homeland Security ("DHS") is a cabinet department within the U.S. federal government.  Its functions include regulating entry into the United States and granting asylees prior approval to travel internationally.  It is also responsible for implementing and enforcing the INA.

2

8.     Defendant Lori Scialabba is the Acting Director of the U.S. Customs and Immigration Services.  She is sued in her official capacity.

9.     Defendant U.S. Customs and Immigration Services ("USCIS") is an agency within DHS whose primary functions include adjudication of asylum and derivative asylum claims.

10.    Defendant Rex W. Tillerson is the U.S. Secretary of State.  The Secretary of State has authority to determine and implement certain asylum procedures for non-citizens.  Defendant Tillerson is sued in his official capacity.

11.    Defendant U.S. Department of State ("State Department") is responsible for, *inter alia*, facilitation of issuance of visas for asylees and derivative asylees seeking entry into the United States.

## JURISDICTION AND VENUE

12.    There is federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under Article II of the Constitution, the First Amendment, the Fifth Amendment, the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1152, 1182(f), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553, 706.  Additionally, there is jurisdiction under 28 U.S.C. § 1346 (providing jurisdiction in civil actions against the United States) and 28 U.S.C. § 1361 (providing jurisdiction to compel officers and employees of the above-listed federal agencies to do her or his duty).  This Court has power to award the declaratory and injunctive relief requested herein under the Declaratory Judgment Act (28 U.S.C. §§ 2201–2202), the APA (5 U.S.C. § 706), and 28 U.S.C. § 1361.

13.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this district.

## FACTUAL ALLEGATIONS

### I.  Plaintiff is Granted Asylum Status and Files Derivative Asylum Petitions

14.     Plaintiff fled Syria to escape near-certain death at the hands of two sectarian military forces, the Sunni-aligned Free Syrian Army ("FSA") fighting against the Assad regime and the Alawite-aligned Syrian Arab Army fighting for the Assad regime ("SAA").  The FSA and SAA were vying for territorial control of Aleppo and both targeted Plaintiff.  The FSA targeted him because Plaintiff lived in a part of Aleppo controlled by the SAA, and the FSA wrongly assumed that Plaintiff was sympathetic to the SAA.  The SAA targeted Plaintiff because of his religious faith and because he travelled to FSA-controlled territory to manage his family's business.

15.     Members of the FSA and SAA extorted, falsely imprisoned, and tortured Plaintiff, and they threatened Plaintiff with death.  Members of the SAA also threatened to rape his wife.  Following torture and imprisonment at the hands of the SAA, the FSA placed Plaintiff on a "kill list" and the SAA attempted to conscript him.  Plaintiff fled Syria at the urging of his friends and family.

16.     Upon arriving in the United States in March 2014, Plaintiff requested asylum, and a USCIS officer determined that Plaintiff has established a credible fear of returning to Syria.  Plaintiff filed an initial Application for Asylum and Withholding of Removal with USCIS and awaited a response, eager to find a way to bring his wife and two children to safety in the United States.

17.     By summer 2015, with Plaintiff's asylum application still pending, the security situation in Syria further deteriorated.  In July 2015, Plaintiff's three-year-old son fell three floors to his death while attempting to escape militia rocket fire that hit his home.  Following his son's death, Plaintiff filed a petition for Humanitarian Parole with USCIS in an attempt to secure the

lives and wellbeing of his wife and daughter. That petition was rejected and Plaintiff subsequently filed an amended asylum application.

18. On May 27, 2016, a USCIS Immigration Judge in Chicago granted Plaintiff asylum. In so ruling, the Immigration Court made a finding that returning Plaintiff to Syria would threaten his life or freedom and would thus violate the United Nations Convention Against Torture and the INA. DHS did not appeal the decision, which became final at the end of June 2016.

19. On July 5, 2016, having received asylum status, Plaintiff filed Refugee/Asylee Relative Petitions with the USCIS under Form I-730. The petitions sought derivative asylum for his wife and daughter, pursuant to INA § 208(b)(3) and 8 C.F.R. § 208.21.

20. Prior to January 2017, Defendants processed Plaintiff's petitions according to standard legal procedures. USCIS's Nebraska Service Center initially processed Plaintiff's petitions and evaluated whether they adequately established a legally cognizable relationship (spousal and parent) between Plaintiff and his beneficiaries. Plaintiff was never notified of any deficiencies in his petitions, and his petitions were referred to a regional USCIS office for a thorough security evaluation, which they cleared.

21. In the normal course, Plaintiff's petitions would have continued being processed. Specifically, a USCIS Officer at the Nebraska Service Center would make a final determination regarding the petitions and, assuming they were approved, the petitions would have been routed to the Department of State's National Visa Center. *See* Second Declaration of Andrew B. Breidenbach in Support of Plaintiff's Renewed Application for a Temporary Restraining Order and Preliminary Injunction ("Second Breidenbach Decl.") Ex. TT. After additional processing at the National Visa Center, the approved I-730s would have been forwarded to a U.S. Embassy or consulate for an in-person interview, in which a USCIS Officer or a consular officer acting on

behalf of USCIS would confirm the identify and eligibility of Plaintiff's wife and daughter. *Id.* From there, USCIS would arrange for Plaintiff's wife and daughter to travel to the United States and provide them with visas, referred to as V92 documents, with which they would have been permitted to travel to the United States. *Id.* Finally, at a port of entry in the United States, a Customs and Border Patrol Officer would have made a final determination to allow them to enter the country. *Id.*

22. President Trump seeks to change all that.

## II. **President Trump Issues Two Executive Orders Banning Entry Into The United States**

### A. **President Trump Runs on a Platform of Banning or Limiting Muslim Immigration into the United States.**

23. President Trump's first January 27, 2017 executive order, like its recent March 6 successor, effectuated President Trump's campaign promise, made in a December 7, 2015 press release, to enact a "complete shutdown of Muslims entering the United States." *See* Declaration of Andrew B. Breidenbach in Support of Plaintiff's Application for a Temporary Restraining Order, Preliminary Injunction, and Summary Judgment, Feb. 14, 2017, ECF No. 13 ("Breidenbach Decl.") Ex. A. The press release continued: "there is great hatred towards Americans by large segments of the Muslim population." *Id.*

24. The next day, during an interview discussing his Muslim ban policy, Trump confirmed a reporter's characterization that airline and U.S. government officials would ask people seeking to enter the United States, "Are you Muslim?" "[I]f they said, 'yes,' they would not be allowed in the country." Breidenbach Decl. Ex. B.

25. During his campaign, Trump consistently adhered to the policy of banning Muslims from U.S. soil, stating on March 9, 2016 that "Islam hates us." Breidenbach Decl. Ex. C.

26.     Trump refused to distinguish between the Muslim faith and Muslim terrorists, saying that "[i]t's very hard to separate [radical Islam and Islam itself], because you don't know who is who. . . .  There's a sickness going on that's unbelievable.  And honestly, you have to get to the bottom of it."  Breidenbach Decl. Ex. C.

27.     At a nationally televised Republican debate the next day, Trump claimed that "large portions of a group of people, of Islam, . . . want to use very, very harsh means.  Let me go further. Women are treated horribly. . . .  Women are treated horribly, and other things are happening that are very, very bad."   Breidenbach Decl. Ex. D.

28.     On June 13, 2016, Trump reiterated his promise to ban all Muslims entering this country until "we as a nation are in a position to properly and perfectly screen those people coming into our country."  Breidenbach Decl. Ex. F.

29.     On June 14, 2016, at a campaign rally in Greensboro, North Carolina, Trump attacked "[t]he children of Muslim immigrant parents," stating,  "they're responsible for a growing number . . . of terrorist attacks."  Breidenbach Decl. Ex. G.

30.     On July 17, 2016, in an interview with 60 Minutes, when confronted with the fact that a "Muslim ban" would be unconstitutional, Trump responded, "So you call it territories, ok? We're gonna do territories.  We're gonna not let people come in from Syria."  Breidenbach Decl. Ex. EE.

31.     In a foreign policy speech delivered on August 15, 2016, Trump noted that the United States could not "adequate[ly] screen[]" immigrants because it admits "about 100,000 permanent immigrants from the Middle East every year."   Breidenbach Decl. Ex. I.  During the speech, Trump proposed creating an ideological screening test for immigration applicants, which would "screen out any who have hostile attitudes towards our country or its principles — or who

believe that Sharia law should supplant American law." *Id.*  During the speech, he referred to his proposal as "extreme, extreme vetting." *Id.*

32.  On January 20, 2017, Donald J. Trump was inaugurated as President of the United States.  In his first television interview as President, he again referred to his plan for "extreme vetting: we're not letting people in if we think there's even a little chance of some problem." Breidenbach Decl. Ex. L.

33.  On January 27, 2017, President Trump gave an interview on the Christian Broadcasting Network.  During that interview, President Trump confirmed his intent to prioritize Christians in the Middle East for admission as refugees, asserting (falsely) that "[i]f you were a Muslim you could come in [to the United States], but if you were a Christian, it was almost impossible . . . .  And I thought it was very, very unfair.  So we are going to help them." Breidenbach Decl. Ex. M.

**B.   President Trump Signs the First Executive Order, Resulting in Numerous Legal Challenges, Including the Instant Case.**

34.  On January 27, 2017, one week after being sworn in, President Trump signed Executive Order 13769, titled "Protecting the Nation from Foreign Terrorist Entry into the United States."  Breidenbach Decl. Ex. N.

35.  During a signing ceremony for the Executive Order on January 27, 2017, President Trump stated, "Protection of the nation from foreign terrorist entry into the United States." Breidenbach Decl. Ex. P.  He then added: "We all know what that means." *Id.*

36.  The first executive order imposed a series of illegal and unconstitutional limitations on the manner in which non-citizens may seek and obtain entry into the United States.  President Trump used it to suspend entry of immigrants and nonimmigrants from seven Muslim-majority countries referred to in INA § 217(a)(12), 8 U.S.C. § 1187(a)(12), including Syria, after

proclaiming that allowing entry "would be detrimental to the interests of the United States." Breidenbach Decl. Ex. P § 3(a), (c).  The first order also suspended the United States Refugee Admissions Program ("USRAP") for 120 days and directed the Secretaries of State and Homeland Security to favor non-Muslims for entry once USRAP resumed.  *Id.* § 5(a), (e).  Finally, the first order proclaimed that entry of Syrian refugees is "detrimental to the interests of the United States" and suspended their entry "indefinitely."  *Id.* § 5(c).

37.    The initial order received wide-ranging condemnation from national security experts, government officials, and members of civil society.

38.    In a recent joint declaration, ten former national security, foreign policy, and intelligence officials in the United States Government affirmed, under penalty of perjury, that "[a]s a national security measure, the [first executive order] is unnecessary.  National security-based immigration restrictions have consistently been tailored to respond to: (1) specific, credible threats based on individualized information, (2) the best available intelligence and (3) thorough interagency legal and policy review.  This Order rests not on such tailored grounds, but rather, on (1) general bans (2) not supported by any new intelligence that the Administration has claimed, or of which we are aware, and (3) not vetted through careful interagency legal and policy review." Breidenbach Decl. Ex. X.  These officials further declared that "[r]ebranding a proposal first advertised as a 'Muslim Ban' as 'Protecting the Nation from Foreign Terrorist Entry into the United States' does not disguise the Order's discriminatory intent, or make it necessary, effective, or faithful to America's Constitution, laws, or values."  *Id.* ¶ 9.

39.    Similarly, then-Acting U.S. Attorney General Sally Yates broke with the President in a Department of Justice letter circulated on January 30, 2017, in which she stated that she was not "convinced that the Executive Order is lawful" and that, "for as long as [she] is the Acting

Attorney General, the Department of Justice will not present arguments in defense of the Executive Order[.]" Breidenbach Decl. Ex. U. Ms. Yates clearly indicated that she based her decision in part on "statements made by an administration or its surrogates close in time to the issuance of [the] Executive Order[.]" *Id.* She was promptly removed.

40.     If there was any doubt as to the Executive Order's anti-Muslim animus, it was dispelled on January 29, 2017 by Rudy Giuliani, who served as a surrogate during Trump's campaign. In an interview with Fox News, Mr. Giuliani explained "the whole history" of the Executive Order: "[W]hen [Trump] first announced it, he said, 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.'" Breidenbach Decl. Ex. Q.

41.     Numerous plaintiffs across the country brought over two dozen cases in federal court challenging the January executive order. In one of the cases, the State of Washington and co-plaintiffs obtained a temporary restraining order prohibiting nationwide enforcement at "United States borders and ports of entry" of Sections 3(c), 5(a)–(c) in their entireties and of Section 5(e) to the extent that section "purports to prioritize refugee claims of certain religious minorities." *Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040, at *2 (W.D. Wash. Feb. 3, 2017). The temporary restraining order also prohibited the government from "proceeding with any action that prioritizes the refugee claims of certain religious minorities" under Section 5(e). *Id.* A three-judge panel of the Ninth Circuit denied the government's request to stay the temporary restraining order *per curiam*. *Washington v. Trump*, No. 17-35105, 2017 WL 526497, at *1 (9th Cir. Feb. 9, 2017).

42.     John Doe filed the instant action on February 13, seeking to permanently enjoin enforcement of the January 27 order. At the time of filing, information received from the

Government led John Doe to believe that his derivative asylum petitions were not being processed, notwithstanding the TRO in *Washington*.  This Court ordered the Government to answer three questions regarding Plaintiff's derivative asylum petitions by February 17 at noon.

43.     Just before midnight on February 16, the Government asked Plaintiff's counsel to stipulate to a one-week extension after representing that the Government had "been able to confirm very little about the pending I-730 petitions" and was "unable to fully respond to the Court's questions at this time."  Second Breidenbach Decl. Ex. UU.  Plaintiff's counsel declined, noting the extreme danger in which Plaintiff's wife and daughter found themselves.  *Id.*

44.     On February 17, the Government reversed its position and filed a response.  It admitted that it had stopped processing derivative asylum applications once President Trump signed the January 27 order but stated that it had resumed processing such applications (including Plaintiff's) following the nationwide injunction entered in the *Washington* case.  The Government also represented that President Trump would be signing a revised executive order promptly. Defs.' Response to Court's Order, Feb. 17, 2017, Dkt. No. 23.  Because of these representations, Plaintiff withdrew his request for a temporary restraining order, and the Court denied without prejudice Plaintiff's other requests as moot, noting that Plaintiff would remain free to seek relief from the Court anew should the situation change.  Order, Feb. 17, 2017, Dkt. No. 25.

45.     After the Government's February 17 response in this action and before the current Executive Order issued, Plaintiff was notified that the USCIS Officer at the Nebraska Service Center has approved his petitions and would be forwarding the approved documents to the National Visa Center for the travel document portion of the I-730 process.  But for President Trump's new Executive Order, interviews are to take place in Amman, Jordan.

46.     In light of these positive developments, Plaintiff began arranging for safe passage for his wife and daughter through Syria and to Jordan.

### C.      President Trump Signs a Revised Executive Order.

47.     On March 6, 2017, President Trump issued a revised Executive Order.   *See* Breidenbach Decl. Ex. FF (the "Executive Order").

48.     Like its earlier incarnation, this Executive Order is motivated by religion- and nationality-based animus, making it both illegal and unconstitutional.  As the President's senior advisor, Stephen Miller, stated before the new Executive Order was signed, "[o]ne of the big differences that you are going to see in the [March] executive order is that it is going to be responsive to the judicial ruling which didn't exist previously. . . .  And so these are mostly minor, technical differences.  Fundamentally, you are still going to have the same, basic policy outcome for the country."  Second Breidenbach Decl. Ex. II.

49.     In the days after President Trump signed the first executive order, President Trump and senior officials in his Administration defended the initial order and its hasty, chaotic roll-out on national security grounds.  On January 30, 2017, President Trump tweeted: "If the ban were announced with a one week notice, the 'bad' would rush into our country during that week.  A lot of bad 'dudes' out there!"  Second Breidenbach Decl. Ex. GG.  White House spokesman Sean Spicer stated: "At the end of the day, what was the other option? To rush it out quickly, telegraph it five days so that people could rush into this country and undermine the safety of our nation?" *Id.* ¶ 4.  On February 9, 2017, President Trump claimed he had sought a one-month delay between signing and implementation but was told by his advisors that "you can't do that because then people are gonna pour in before the toughness."  *Id.* Ex. HH.

50.     By the time the current Executive Order was issued, more than a month after the former order was halted by the courts, the Administration had tried — and failed — to create after

the fact a record to justify the travel ban.  *See* Second Breidenbach Decl. Ex. MM.  One DHS study concluded, among other things, that "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity."  *See id.* Ex. JJ.  That study also stated that of the eighty-two U.S. residents DHS had identified as having been involved in terrorism-related offenses since the beginning of the Syrian conflict, *none* came from Syria.  *See id.*  A second DHS study stated, among other things, that "most foreign-born, US-based violent extremists likely radicalized several years after their entry to the United States, limiting the ability of screening and vetting officials to prevent their entry because of national security concerns."  *See id.* Ex. KK.

51.     In signing the new order, President Trump all but dispensed with the pretext of the need for immediate issuance for the sake of national security.  The President had promised prompt issuance of the Executive Order, but then delayed its signing repeatedly, in contradiction to his earlier explanation that the Muslim Ban must be immediately implemented.  Indeed, the media reported last week, after President Trump's address to the Congress, that, "[s]igning the executive order Wednesday, as originally indicated by the White House, would have undercut the favorable coverage [of President Trump's address]" and quoted a White House official to say that "[w]e want (the executive order) to have its own 'moment.'"  Second Breidenbach Decl. Ex. LL.

III.    **The Executive Order Indefinitely Separates Plaintiff from His Immediate Family and Disfavors His Religion**

A.     **Relevant Provisions of the Revised Executive Order.**

52.     Section 1 of the Executive Order states that its purpose is to "protect [the United States'] citizens from terrorist attacks, including those committed by foreign nationals."  Section 1(i) states that the President was "revoking Executive Order 13769 and replacing it with this order, which expressly excludes from the suspensions categories of aliens that have prompted judicial

concerns and which clarifies or refines the approach to certain other issues or categories of affected aliens."

53.     Section 2(c) of new Executive Order suspends the "entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen" — six of the seven countries that were designated in the first order, with Iraq now omitted — for a period of "90 days from the effective date of this order," just like the first order.  The 90-day period is subject to extension.

54.     Section 3 provides for various exceptions and potential waivers to Section 2's travel ban.  Under Section 3(a), "the suspension of entry pursuant to section 2 of this order shall apply only to foreign nationals of the designated countries who: (i) are outside the United States on the effective date of this order; (ii) did not have a valid visa at 5:00 p.m., eastern standard time, on January 27, 2017; and (iii) do not have a valid visa on the effective date of this order." *See* Executive Order § 3(a)(i)-(iii).

55.     Section 3(b) lists categorical "exceptions" from Section 2: lawful permanent residents, foreign nationals who are admitted or paroled into the United States "on or after the effective date of this order, foreign nationals with "a document other than a visa . . . that permits him or her to travel to the United States and seek entry or admission, such as an advance parole document," dual nationals traveling on passports issued by a non-designated country, foreign nationals traveling on certain diplomatic visas, and foreign nationals who have been granted asylum as well as refugees who have been admitted to the United States.  Executive Order § 3(b)(i)-(iv).

56.     Section 3(c) of the Executive Order provides that "a consular officer, or as appropriate, the Commissioner, U.S. Customs and Border Protection (CBP) . . . may, in the consular officer's or the CBP official's discretion, decide on a case-by-case basis to authorize the

issuance of a visa to, or to permit the entry of, a foreign national for whom entry is otherwise suspended" if he or she determines that "denying entry during the suspension period would cause undue hardship . . . [and the individual's] entry would not pose a threat to national security and would be in the national interest." *Id.* § 3(c).

57.     Like the first Executive Order, the new Executive Order provides for an expansion of its immigration ban to nationals from additional countries in the future.  Section 2(a) directs the Secretary of Homeland Security, in consultation with the Secretary of State as well as the Director of National Intelligence, to "conduct a worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA . . . to determine that the individual is not a security or public safety threat."  Executive Order § 2(a).  Those officials are instructed to submit a report on "the results of the worldwide review" to the President, as well as "a list of countries that do not provide adequate information," within 20 days of the effective date of the Executive Order.  *Id.* § 2(b).  The Secretary of State is then instructed to "request that all foreign governments that do not supply [the necessary] information regarding their nationals begin providing it within 50 days of notification."  *Id.* § 2(d).  After that 50-day period, the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, "shall submit to the President a list of countries recommended for inclusion" in the travel ban.  *Id.* § 2(e).  Those officials are also authorized to "submit to the President," at "any point after the submission of the list" of countries recommended for inclusion, "the names of additional countries recommended for similar treatment."  *Id.* § 2(f).

58.     Section 6 of the Executive Order suspends USRAP and the "travel" of all "refugees" to the United States for a period of 120 days, and suspends all "decisions" by the

Secretary of Homeland Security on applications for refugee status for 120 days. *Id.* § 6(a). After those 120 days are over, "the Secretary of Homeland Security shall resume making decisions on applications for refugee status *only* for stateless persons and nationals of countries for which the Secretary of State, the Secretary of Homeland Security, and the Director of National Intelligence have jointly determined" that "additional procedures"—identified by those officials as being necessary "to ensure that individuals seeking admission as refugees do not pose a threat" to the United States—have been "implemented" and "are adequate to ensure the security and welfare of the United States." *Id.* § 6(a).

59.   Under Section 14, the revised Executive Order takes effect on March 16, 2017.

**B.    The Revised Executive Order, Once Effective, Will Interfere with Plaintiff's Derivative Petitions and with His Ability to be Reunited with His Wife and Daughter.**

60.   In material respects, the new Executive Order mirrors the operative provisions of the prior executive order. As the Government informed this Court, the relevant agencies stopped processing derivative asylum applications once the prior order was signed and until it was enjoined.

61.   Question-and-answer guidance issued by the Department of Homeland Security indicates that the Government will follow the same approach under the revised Executive Order:

**Can the exception for refugee admission be used for Refugee/Asylee Relative Petitions (Form I- 730) cases where a family member is requesting a beneficiary follow to join?**

No. Individuals who already have valid visas or travel documents that permit them to travel to the United States are exempt from the Executive Order. To the extent that an individual does not yet have such documents, please contact the Department of State.

Second Breidenbach Decl. Ex. RR.

62.   The Executive Order also makes clear on its face that, once it goes into effect, it will halt the processing of Plaintiff's derivative petitions. As Syrian nationals, Plaintiff's wife and

16

daughter will be barred from receiving a visa and from entry for 90 days under Section 2(c), unless they can affirmatively obtain a waiver.  And, after the 90-day ban, his family risks an even longer bar from entering the United States since, under Section 2(e), the Secretary of Homeland Security is required to present President Trump with a "list of countries recommended for inclusion in a Presidential proclamation that would prohibit . . . entry" of people from identified countries until the Secretary of Homeland Security decides otherwise.

63.     Plaintiff's wife and daughter also fall under the ban's scope under Section 3(a) because, by the Government's own admission, they will not be able to obtain valid visas by March 16, and so also cannot be present in the U.S. by that date.  *See* Breidenbach Decl. UU.  Moreover, they did not have valid visas as of 5:00 PM on January 27, 2017.

64.     Nor do Plaintiff's wife and daughter fall within the scope of any of the exemptions in Section 3(b).  Plaintiff's wife and daughter are not — and will not be by the effective date of the Executive Order — lawful permanent residents, admitted or parole foreign nationals, travel document holders, dual nationals, diplomatic visa holders, or asylees.

65.     It also appears that Plaintiff's petitions will be affected by the suspension of USRAP, given that USRAP is involved in the processing of I-730 applicants, although the Government has previously suggested this might not be the case.

66.     Although the Government might suggest that nothing stops Plaintiff's wife and child from applying for a "waiver" under Section 3(c) of the Executive Order, in order to obtain a waiver under Section 3(c), Plaintiff's wife and child would need to "demonstrate[] . . . that denying entry during the suspension period would cause undue hardship, and that his or her entry would not pose a threat to national security and would be in the national interest."  Although this case undoubtedly involves an undue burden, Plaintiff's wife and child should not be required to make

this showing, or to show that their entry "would be in the national interest," given that, as set forth below, the Executive Order exceeds the scope of the President's authority and is unconstitutional.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### DISCRIMINATION IN VIOLATION OF
### THE IMMIGRATION AND NATIONALITY ACT

67.     Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

68.     The Executive Order exceeds the President's lawful authority under Section 212(f) of the INA, as interpreted in the context of the INA as a whole and as limited by specific provisions of the INA.

69.     For example, the INA prohibits discrimination in the issuance of immigrant visas based on race, nationality, place of birth, or place of residence.  8 U.S.C. § 1152(a)(1)(A).  The Executive Order, both facially and as implemented, discriminates on the basis of nationality, place of birth, and/or place of residence in the issuance of visas, in violation of the INA.

70.     Defendants' violations of the INA have harmed and continue to harm Plaintiff by, among other injuries, indefinitely denying him access to his family.

### SECOND CAUSE OF ACTION
### SUBSTANTIVE VIOLATION OF THE APA

71.     Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

72.     The APA prohibits federal agency action that is arbitrary, capricious, unconstitutional, or contrary to statute.  5 U.S.C. § 706(2)(A)–(C).

73.     In implementing the Executive Order, as alleged herein, Defendant federal agencies have acted in violation of the U.S. Constitution and federal statutes, thereby violating the APA.

74.     Defendants' violations of the APA have harmed and continue to harm Plaintiff by, among other injuries, indefinitely denying him access to his family.

**THIRD CAUSE OF ACTION**
**FIFTH AMENDMENT – DEPRIVATION OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS RIGHTS**

75.     Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

76.     The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving individuals of their fundamental rights and important liberty interests without due process of law.

77.     Plaintiff's fundamental rights include his right to the "integrity of [his] family unit." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *see also Moore v. City of E. Cleveland*, 431 U.S. 494, 503–05 (1977) ("Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition."). Plaintiff's fundamental rights as a parent also include his right to the custody, care, and management of his daughter and the right to "give [his daughter] religious training and to encourage [her] in the practice of religious belief." *Prince v. Massachusetts*, 321 U.S. 158, 165 (1944).

78.     The Executive Order directly and substantially infringes on Plaintiff's fundamental rights. Plaintiff cannot return to Syria without facing near-certain death. And Plaintiff's wife and daughter cannot come to the United States because their derivative applications will be suspended by the Executive Order once it becomes effective.

79.     The Due Process Clause forbids Defendants from infringing on Plaintiff's fundamental rights unless the infringement is narrowly tailored to serve a compelling

governmental interest.  On its face and as applied, the Executive Order fails this test.  It is not narrowly tailored to protect national security interests — it blocks all persons from Syria from entry into the United States, regardless of their relationship to terrorism.  The overbreadth and irrationality of the Executive Order is strikingly apparent here: it blocks a three-year-old child from entry, stranding her in a country that DHS determined is too dangerous for her father.  It is a "Muslim ban" by another name.

80.     The Executive Order also infringes on Plaintiff's procedural due process rights. Plaintiff has a liberty interest to live together with his wife and child in the United States. *See*, *e.g.*, *Stanley*, 405 U.S. at 651.  This liberty interest flows from the solicitude granted marriage and family integrity by American historical tradition and is evident in various provisions of immigration law, including the federal government's derivative asylum process.  Accordingly, the Fifth Amendment vests Plaintiff with procedural due process rights that include the right to have his application for derivative asylum fairly adjudicated.  By suspending his derivative asylum application on the basis of national origin and religion, Defendants deprived Plaintiff of his liberty interests for illegitimate reasons and without constitutionally adequate procedures.

81.     Accordingly, in issuing and implementing the Executive Order, Defendants violated the substantive and procedural due process guarantees of the Fifth Amendment.

**FOURTH CAUSE OF ACTION**
**FIFTH AMENDMENT – EQUAL PROTECTION**

82.     Plaintiff repeats and incorporates by reference each and every allegation contained in the previous paragraphs as if fully set forth herein.

83.     The Due Process Clause of the Fifth Amendment guarantees aliens living within the United States equal protection of the law.

84.    Section 3(c) of the Executive Order classifies individuals and targets Plaintiff for discriminatory treatment on the basis of national origin and religion without lawful justification.

85.    The Executive Order was motivated by discriminatory animus and has a disparate impact on members of the Muslim faith.

86.    The Executive Order's discriminatory terms and application are not narrowly tailored to serve a compelling government interest.

87.    Through their actions, Defendants violated and are violating the Fifth Amendment's guarantee of equal protection.

## FIFTH CAUSE OF ACTION
## FIRST AMENDMENT – ESTABLISHMENT CLAUSE

88.    Plaintiff repeats and incorporates by reference each and every allegation contained in the proceeding paragraphs as if fully set forth herein.

89.    The true purpose of the Executive Order is hostility toward Islam.  The proffered secular purpose, national security, is a sham.

90.    The Executive Order was motivated by discriminatory animus and has a disparate impact members of the Muslim faith.  It therefore violates the Establishment Clause of the First Amendment by not pursuing a course of neutrality with respect to different religions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment should be entered in favor of Plaintiff and against the Defendants as follows:

(a)    Declare that the Executive Order, including Section 2(c), is unlawful and unconstitutional facially and as applied to Plaintiff's pending petitions for derivative asylum for his wife and daughter;

(b)      Declare that Defendants are obligated to promptly and fairly adjudicate Plaintiff's petitions for derivative asylum solely in accordance with preexisting law, including INA § 208(b)(3), 8 C.F.R. § 208.21, and the Constitution, and without regard to the letter or spirit of the Executive Order;

(c)      Declare that Defendants may not deny Plaintiff's wife and daughter visas nor bar their entry into the United States in violation of INA § 208(b)(3), 8 C.F.R. § 208.21, and the Constitution or in furtherance of the letter or spirit of the Executive Order;

(d)      Enjoin the enforcement of Section 2(c) and such other portions of the Executive Order that affect Plaintiff's derivative petitions and/or the entry of Plaintiff's wife and child into the United States and order that, in the event that Plaintiff's petitions for asylum are granted, Defendants are obligated (i) to promptly issue immigration visas to Plaintiff's wife and daughter consistent with pre-existing law, and (ii) to permit them to travel to and enter the United States with those visas consistent with pre-existing law; and

(e)      For any such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury for all issues so triable as a matter of right.


Dated: New York, New York
       March 10, 2017

Respectfully submitted,


By: __/s/ Vincent Levy_____
    HOLWELL SHUSTER & GOLDBERG LLP
    Vincent Levy (vlevy@hsgllp.com)
    Lauren Giudice (lgiudice@hsgllp.com)
    Andrew Breidenbach (abreidenbach@hsgllp.com)
    Andrei Vrabie (avrabie@hsgllp.com)
    Matthew V.H. Noller (mnoller@hsgllp.com)
    Sarah Sternlieb (ssternlieb@hsgllp.com)
    Kevin Benish (kbenish@hsgllp.com) (*law clerk –
        New York State Bar admission pending*)
    750 Seventh Avenue, 26th Floor
    New York, NY 10019
    (646) 837-5151

    PINES BACH LLP
    Lester A. Pines, SBN 1016543
    Tamara B. Packard, SBN 1023111
    Alison TenBruggencate, SBN 1018869
    122 West Washington Ave., Ste. 900
    Madison, WI 53703
    (608) 251-0101 (telephone)
    (608) 251-2883 (facsimile)
    lpines@pinesbach.com
    tpackard@pinesbach.com
    atenbruggencate@pinesbach.com

    *Attorneys for Plaintiff*