UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

JOHN DOE,

                        Plaintiff,

                -against-

DONALD J. TRUMP, as President of the United
States of America; JOHN F. KELLY, as
Secretary of the Department of Homeland
Security; THE DEPARTMENT OF
HOMELAND SECURITY; LORI
SCIALABBA, as Acting Director of the U.S.
Citizenship and Immigration Services; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; REX W. TILLERSON, as Secretary
of State; U.S. DEPARTMENT OF STATE; and
THE UNITED STATES OF AMERICA,

                       Defendants.

**Civil Action No.: 17-cv-112**

Chief Judge William M. Conley

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S RENEWED APPLICATION FOR A TEMPORARY RESTRAINING
## ORDER AND PRELIMINARY INJUNCTION

HOLWELL SHUSTER & GOLDBERG LLP
750 Seventh Avenue, 26th Floor
New York, NY 10019
(646) 837-5151

Dated: March 10, 2017

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND .................................................................................... 3

ARGUMENT ....................................................................................................... 11

    I.   PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIM ........ 12

        A.   THE EXECUTIVE ORDER VIOLATES THE INA ....................................... 12

        B.   THE EXECUTIVE ORDER UNLAWFULLY INTERFERES WITH
            PLAINTIFF'S FUNDAMENTAL RIGHT TO FAMILY INTEGRITY, IN
            VIOLATION OF DUE PROCESS .................................................... 17

        C.   THE EXECUTIVE ORDER VIOLATES THE ESTABLISHMENT CLAUSE
            AND EQUAL PROTECTION BY DISPROPORTIONATELY BURDENING
            MUSLIMS BASED ON ANTI-MUSLIM ANIMUS ........................................ 23

        D.   THE EXECUTIVE ORDER UNCONSTITUTIONALLY DISCRIMINATES
            ON THE BASIS OF NATIONALITY ............................................... 26

        E.   THE GOVERNMENT CANNOT JUSTIFY THE EXECUTIVE ORDER
            BASED ON SO-CALLED PRESIDENTIAL POWERS ................................. 28

    II.  PLAINTIFF STANDS TO SUFFER IRREPARABLE INJURY, AND THE
       EQUITIES STRONGLY TILT IN HIS FAVOR ....................................... 29

CONCLUSION ...................................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Ill. v. Alvarez*,
  679 F.3d 583 (7th Cir. 2012) ........................................................................... 11

*Andreiu v. Ashcroft*,
  253 F.3d 477 (9th Cir. 2001) .......................................................................... 30

*Aziz v. Trump*,
  No. 1:17-cv-116 (LMB/TCB), 2017 WL 465917 (E.D. Va. Feb. 3, 2017) ............................. 6

*Aziz v. Trump*,
  No. 1:17-cv-116 (LMB/TCB), 2017 WL 580855 (E.D. Va. Feb. 13, 2017) ............ 7, 24, 25, 26

*Bhd. of Maint. of Way Emps. v. CSX Transp., Inc.*,
  478 F.3d 814 (7th Cir. 2007) .......................................................................... 13

*Brokaw v. Mercer Cty.*,
  235 F.3d 1000 (7th Cir. 2000) ..................................................................... 18, 19

*Bustamante v. Mukasey*,
  531 F.3d 1059 (9th Cir. 2008) ........................................................................ 21

*Church of Lukami Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) .................................................................................. 24

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) .................................................................................. 27

*Darweesh v. Trump*,
  No. 17 Civ. 480 (AMD), 2017 WL 388504 (E.D.N.Y. Jan. 28, 2017) ................................. 6

*Doe ex rel. Doe v. Elmbrook School Dist.*,
  687 F.3d 840 (7th Cir. 2012) .......................................................................... 23

*Elrod v. Burns*,
  427 U.S. 347 (1976) .................................................................................. 29

*Ex parte Quirin*,
  317 U.S. 1 (1942) .................................................................................... 29

*Exodus Refugee Immigration, Inc. v. Pence*,
  165 F. Supp. 3d 718 (S.D. Ind. 2016) ................................................................. 19

ii

*Exodus Refugee Immigration, Inc. v. Pence*,
   838 F.3d 902 (7th Cir. 2016) ............................................... 13, 19

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ............................................... 27, 29

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ............................................................... 16

*Fiallo v. Bell*,
   430 U.S. 787 (1977) ............................................................. 20, 21

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*,
   549 F.3d 1079 (7th Cir. 2008) ................................................ 11

*Griswold v. Connecticut*,
   381 U.S. 479 (1965) ............................................................... 18

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004) ............................................................... 28

*Heckler v. Chaney*,
   470 U.S. 821, 833 n.4 (1985) ................................................. 13

*Hillman v. Maretta*,
   133 S. Ct. 1943 (2013) ........................................................... 16

*Jessen v. Vill. of Lyndon Station*,
   519 F. Supp. 1183 (W.D. Wis. 1981) ...................................... 29

*Joelner v. Vill. of Wash. Park*,
   378 F.3d 613 (7th Cir. 2004) .................................................. 29

*KH Outdoor, LLC v. City of Trussville*,
   458 F.3d 1261 (11th Cir. 2006) .............................................. 31

*Kerry v. Din*,
   135 S. Ct. 2128 (2014) ........................................................... 22

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ............................................................. 20, 21

*Larson v. Valente*,
   456 U.S. 228 (1982) ............................................................. 23, 24

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
   45 F.3d 469 (D.C. Cir. 1995) ............................................... 12, 14

*Leiva-Perez v. Holder*,
  640 F.3d 962 (9th Cir. 2011) .................................................................... 30

*Louhghalam v. Trump*,
  No. 17-cv-10154 (D. Mass. Feb. 3, 2017) ................................................ 23

*Loving v. Virginia*,
  388 U.S. 1 (1967) ..................................................................................... 18

*Luis v. United States*,
  136 S. Ct. 1083 (2016) ............................................................................. 17

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ............................................................................ 21, 22

*McCreary Cty. v. ACLU of Ky.*,
  545 U.S. 844 (2005) ...................................................................... 23, 24, 26

*Meyer v. Nebraska*,
  262 U.S. 390 (1923) ................................................................................. 18

*Milwaukee Cty. Pavers Ass'n v. Fiedler*,
  707 F. Supp. 1016 (W.D. Wis.), *modified*, 710 F. Supp. 1532 (W.D. Wis. 1989) .................. 29

*Mohammed v. United States*,
  No. CV 17-00786 AB (PLAx), 2017 WL 438750 (C.D. Cal. Jan. 31, 2017) ........................ 6

*Moore v. City of E. Cleveland*,
  431 U.S. 494 (1977) ................................................................................. 18

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
  413 U.S. 405 (1973) ................................................................................. 16

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015) ............................................................................. 18

*Olsen v. Albright*,
  990 F. Supp. 31 (D.D.C. 1997) ................................................................ 14

*Omar v. Kerry*,
  No. 15-CV-01760-JSC, 2015 WL 5964901 (N.D. Cal. Oct. 13, 2015) ................................ 30

*Personnel Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979) ................................................................................. 23

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*,
  268 U.S. 510 (1925) ................................................................................. 18

iv

*Ping Ping Zhou v. Kane,*
  No. CV07-0785-PHX-DGC (ECV), 2007 WL 1559938 (D. Ariz. May 29, 2007) ................. 30

*Preston v. Thompson,*
  589 F.2d 300 (7th Cir. 1978) ........................................................................... 29, 30

*Ramirez-Vicario v. Achim,*
  No. 04 C 0301, 2004 WL 392573 (N.D. Ill. Feb. 24, 2004) ...................................... 31

*Romer v. Evans,*
  517 U.S. 620 (1996) ........................................................................................... 28

*School Dist. of Abingdon Twp. v. Schemp,*
  374 U.S. 203 (1963) ........................................................................................... 23

*Troxel v. Granville,*
  530 U.S. 57 (2000) ............................................................................................. 18

*United States v. Salerno,*
  481 U.S. 739 (1987) ........................................................................................... 21

*United States v. Tittjung,*
  235 F.3d 330 (7th Cir. 2000) .............................................................................. 28

*United States v. U.S. Coin & Currency,*
  401 U.S. 715 (1971) ........................................................................................... 30

*United States v. Windsor,*
  133 S. Ct. 2675 (2013) ....................................................................................... 28

*U.S. Dep't of Agric. v. Moreno,*
  413 U.S. 528, 534–35 (1973) .............................................................................. 29

*Vayeghan v. Kelly,*
  No. CV 17-0702, 2017 WL 396531 (C.D. Cal. Jan. 29, 2017) ................................... 6

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.,*
  429 U.S. 252 (1977) ........................................................................................... 24

*Vision Church v. Vill. of Long Grove,*
  468 F.3d 975, (7th Cir. 2006)` ............................................................................ 23

*Washington v. Trump,*
  No. C17-0141JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017) ............................... 6

*Washington v. Trump,*
  847 F.3d 1151 (9th Cir. 2017) ................................................................... *passim*

*Whitman v. Am. Trucking Ass'ns, Inc.*,
   531 U.S. 457 (2001) ................................................................ 16

*Winnig v. Sellen*,
   731 F. Supp. 2d 855 (W.D. Wis. 2010) ................................... 11

*Wong Wing Hang v. INS*,
   360 F.2d 715 (2d Cir. 1966) .................................................... 20

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ................................................................ 29

*Zablocki v. Redhail*,
   434 U.S. 374 (1978) .......................................................... 18, 19

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   135 S. Ct. 2076 (2015) ..................................................... 12, 28

## Statutes and Regulations

Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* ................................... *passim*
   8 U.S.C. § 1101(a)(27) ............................................................ 16
   8 U.S.C. § 1152 ................................................................. 13, 15
   8 U.S.C. § 1153 ................................................................. 15, 16
   8 U.S.C. § 1154 ..................................................................... 16
   8 U.S.C. § 1157 ..................................................................... 15
   8 U.S.C. § 1158 ................................................................... 4, 15
   8 U.S.C. § 1182(f) ................................................................. 12
   8 U.S.C. § 1185(a) ................................................................. 12

Immigration and Nationality Act of 1952, Pub. L. 82-414, § 212(e), 66 Stat. 163 (1952) .......... 13

Immigration and Nationality Act of 1965, Pub. L. 89-236, §§ 2, 215(a) 79 Stat. 911 (1965) ..... 13

8 C.F.R. § 208.14 ....................................................................... 11

8 C.F.R. § 208.21 ......................................................................... 3

## Other Authorities

DHS, Annual Flow Report, Refugees and Asylees: 2005 ......................... 16

Executive Order 13780 (Mar. 6, 2017) ................................................. *passim*

Executive Order 13769 (Jan. 27, 2017) ................................................ *passim*

Final Act of the 1951 U.N. Conference of Plenipotentiaries on the Status of Refugees and
Stateless Persons, Recommendation ............................................. 16

H.R. Rep. No. 89-745 (1965)................................................................. 13, 14

Pres. Proc. No. 5517 (Aug. 22, 1986)..................................................... 17

S. Rep. No. 89-748 (1965).................................................................... 14, 16

## PRELIMINARY STATEMENT

This is an action to enjoin the unlawful immigration ban that President Trump has now twice sought to implement by executive order, first on January 27, 2017, and then again on March 6, 2017. As the Court is aware, Plaintiff is a lawful resident alien who, after more than a year of thorough vetting by U.S. immigration authorities, was granted asylum status in May 2016 on account of the torture and persecution he had suffered in Syria and the risk of serious harm he faced there should he return. He promptly filed derivative petitions to secure asylum status for his wife and three-year old daughter, both of whom had been forced to stay behind in war-torn Aleppo. Under the Immigration and Nationality Act ("INA"), approval of those petitions should have been a foregone conclusion. Nevertheless, President Trump has signed two executive orders that, ostensibly in "the interests of the United States," seek to suspend the entry of all Syrians — and thus threaten to keep Plaintiff apart from his wife and young child, who remain in Aleppo, hiding from warring factions who wish them both dead.

The March 6 executive order (the "Executive Order") is President Trump's attempt to salvage the January 27 executive order, which the federal courts enjoined as unconstitutional. But Version 2.0 of the Executive Order is no better than Version 1.0. The Executive Order accomplishes the same unlawful goals through the same unlawful means as the January 27 order and should promptly be set aside. It violates the terms of the INA and frustrates Congress's purpose in passing that statute, which prohibits discrimination on the basis of national origin and was intended to secure the right of family integrity. It also violates the Constitution of the United States in multiple respects. By interfering with Plaintiff's fundamental right to family integrity in a manner that is not narrowly tailored to a compelling government interest, and without adequate procedures, the Executive Order violates the Due Process Clause. By banning

nationals from predominantly Muslim countries and reflecting an invidious purpose of disfavoring Muslims, it violates the Establishment Clause and the Fifth Amendment's guarantee of Equal Protection. And by banning the entry of Syrians based solely on their nationality, it violates Equal Protection.

Indeed, since President Trump first sought to implement a ninety-day travel ban — purportedly to give the Government time to study vetting procedures — it has become even clearer that there is no lawful justification for the ban. Unable to articulate a justification for the January 27 order in any of the legal challenges to that order, the Government sought post-hoc vindication through a study conducted by the Department of Homeland Security. But DHS came up empty, concluding that "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity." President Trump nonetheless simply renewed the ninety-day travel ban, touting its promulgation to supporters as a strike against "radical Islamic terrorism." If the Government had been serious about devising more stringent vetting procedures (the ostensible goal of the Executive Order), then presumably it would have made some progress on that front in the more than five weeks since January 27. But there is no evidence that the Government has come up with anything other than pretextual justifications for the same anti-Muslim travel ban it sought to implement in the January 27 order.

Meanwhile, although the Government has been processing Plaintiff's derivative petitions since the time he filed this lawsuit, the unlawful Executive Order still threatens to visit irreparable injury upon Plaintiff and his family because it will, if enforced according to its terms, bar Plaintiff's wife and daughter from receiving visas or entering the United States. The Court should therefore enter temporary and/or preliminary injunctive relief barring the Government

from relying on the Executive Order in processing Plaintiff's petitions and otherwise

adjudicating the entry of his family into the United States.

## FACTUAL BACKGROUND[1]

**A.      Plaintiff Seeks Asylum in the United States for Himself and His Family**

Plaintiff is a thirty-two-year-old Syrian man and Sunni Muslim who resides in

Wisconsin.  Before he came to the United States, he faced near-certain death at the hands of two

warring forces in Aleppo: the Sunni-aligned Free Syrian Army ("FSA") and the Alawite-aligned

Syrian Arab Army ("SAA").  The FSA and SAA have been engaged in a six-year civil war for

control of Aleppo.  In 2013, the FSA began targeting Plaintiff on the incorrect belief that

Plaintiff was sympathetic to the SAA; the SAA, for its part, targeted Plaintiff because he was

Sunni and owned a business in FSA-controlled territory.  FSA and SAA soldiers extorted, falsely

imprisoned, tortured, and threatened to kill Plaintiff.  The SAA threatened to rape his wife.

After learning that he had been "marked for death" by the FSA and conscripted into the

SAA, Plaintiff fled Syria in March 2014 and sought asylum in the United States.  In April 2014,

he filed an initial Application for Asylum and for Withholding of Removal with the United

States Citizenship and Immigration Services ("USCIS").  While his initial application was under

review, the building where his wife and children were hiding in Aleppo was hit by rocket fire.  In

the ensuing panic, Plaintiff's three-year-old son fell three stories and died.  Unable to comfort his

wife or mourn his son in person, Plaintiff redoubled his efforts to obtain asylum for himself and

---

[1]      The facts set forth herein are supported by the accompanying Declaration of Andrew B.
Breidenbach in Support of Plaintiff's Application for a Temporary Restraining Order,
Preliminary Injunction, and Summary Judgment ("Breidenbach Decl.") (Feb. 13, 2017), Dkt. No.
10; Second Declaration of Andrew B. Breidenbach in Support of Plaintiff's Renewed
Application for a Temporary Restraining Order and Preliminary Injunction ("Second
Breidenbach Decl."); and Declaration of John Doe in Support of His Renewed Application for a
Temporary Restraining Order and Preliminary Injunction.

his family and filed an amended asylum application in October 2015.  In May 2016, an

Immigration Judge granted Plaintiff asylum, finding that Plaintiff's return to Syria would

threaten his life or freedom in violation of the U.N. Convention Against Torture.

As soon as the Immigration Judge's decision became final, Plaintiff sought asylum for his

wife and daughter by filing Refugee/Asylee Relative Petitions with USCIS on form I-730.  *See*

INA 8 U.S.C. § 1158 (b)(3); 8 C.F.R. § 208.21.  Plaintiff's derivative asylum petitions establish

that he is an asylee and that his wife and daughter are qualifying beneficiaries.  Plaintiff's wife

does not bear hostile attitudes toward the United States, its Constitution, or its founding

principles.  Neither does his daughter, who is a three-year-old child incapable of holding such

views.  They have never engaged in acts of hatred, persecution, oppression, or terror.  Like

Plaintiff, they would be active and productive members of the Wisconsin community as soon as

they are able.  For now, though, they remain trapped in Syria, where they live in hiding from the

SAA and FSA.  They lack access to basic medical care and adequate food.  And they are at

imminent risk of rape or death.

As of January 26, 2017, approval of Plaintiff's derivative asylum petitions seemed like a

sure thing.  USCIS's processing center in Nebraska had reviewed the petitions, found them to be

in order, and forwarded them to USCIS's Milwaukee office for a security check.  That too

cleared, and the petitions were sent back to Nebraska for final processing.

### B.      Mr. Trump Promises a Muslim Ban and Signs the First Executive Order

Before he was elected President, Donald Trump campaigned on a promise to effectuate a

"complete shutdown of Muslims entering the United States."  Breidenbach Decl. ¶ 2.  Amid

criticism, the then-candidate and his associates shifted their rhetoric, instead targeting countries

with "a proven history of terrorism" as a proxy for Islam.  Breidenbach Decl. Ex. F.  Mr. Trump

acknowledged this pivot as "an expansion" of his proposed "Muslim ban," not a rollback.  *See* Breidenbach Decl. Ex. H.  And he repeatedly refused to distinguish between peaceful Muslims and terrorists, contending that "you don't know who is who."  *See* Breidenbach Decl. ¶ 4.

Syrians, in particular, found themselves in Mr. Trump's cross-hairs during the campaign.  One of Mr. Trump's campaign promises was to "stop the tremendous flow of Syrian refugees into the United States."  Breidenbach Decl. ¶ 7.  He urged citizens to "lock your doors" against Syrian refugees that had resettled in the United States.  *Id.*

Mr. Trump began planning how to follow through on these invidious campaign promises even before taking office.  In a television interview, Rudy Giuliani, a close advisor to Mr. Trump, explained that, after announcing his "Muslim ban," Mr. Trump "called [Mr. Giuliani] up.  He said, 'Put a commission together.  Show me the right way to do it legally.'"  Breidenbach Decl. ¶ 18.

Executive Order 13769, titled "Protecting the Nation from Foreign Terrorist Entry into the United States" and signed by President Trump on January 27, 2017, was the result.  The order barred from the United States the very groups of immigrants President Trump promised to target during his campaign, including all Syrians.  *See* Breidenbach Decl. Ex. N.  Thus, Section 3(c) of the original order categorically prohibited the entry of all aliens from seven Muslim-majority countries, including Syria, for ninety days.  Section 5(a) suspended the U.S. Refugee Admissions Program for all countries for 120 days, and Section 5(c) suspended the entry of Syrian refugees indefinitely.  These provisions applied whether or not a Syrian seeking entry posed any threat of violence or had any connection to terrorist organizations or activities.  Indeed, Section 5(c) applied to Syrians of all ages, including young children like Plaintiff's three-year-old daughter, who is plainly incapable of posing a threat to the United States.

The first executive order also discriminated against Muslims. It directed the Secretary of State, upon resumption of refugee admissions, to "prioritize refugee claims made by individuals on the basis of religious-based persecution, *provided that the religion of the individual is a minority religion in the individual's country of nationality*." Jan. 27 Order § 5(b) (emphasis added); *see also id.* § 5(e) (allowing for exceptions to Section 5(a) "when the person is a religious minority in his country of nationality facing religious persecution"). President Trump was frank about his intent to favor Christians over Muslims. Immediately before signing the Executive Order, President Trump (falsely) asserted that, under earlier refugee policies, "[i]f you were a Muslim you could come in [to the United States], but if you were a Christian, it was almost impossible . . . . And I thought it was very, very unfair. So we are going to help them." Breidenbach Decl. ¶ 14.

At the signing ceremony for the executive order, President Trump stated that its purpose was to "establish[] new vetting measures to keep radical Islamic terrorists out of the United States of America." Breidenbach Decl. ¶ 16. He then added: "We all know what that means." Breidenbach Decl. ¶ 16, Ex. O.

## C. Federal Courts Enjoin the First Executive Order, and the Government Continues Processing Plaintiff's Petitions

Federal courts began hearing legal challenges to the January 27 executive order almost as soon as President Trump signed it. And given the order's irrationality and discriminatory purpose and effect, courts were almost uniform in enjoining its enforcement.[2] Most notably, the

---

[2]     *See Darweesh v. Trump*, No. 17 Civ. 480 (AMD), 2017 WL 388504, at *1 (E.D.N.Y. Jan. 28, 2017); *Vayeghan v. Kelly*, No. CV 17-0702, 2017 WL 396531, at *1 (C.D. Cal. Jan. 29, 2017); *Mohammed v. United States*, No. CV 17-00786 AB (PLAx), 2017 WL 438750, at *1–2 (C.D. Cal. Jan. 31, 2017); *Aziz v. Trump*, No. 1:17-cv-116 (LMB/TCB), 2017 WL 465917, at *1 (E.D. Va. Feb. 3, 2017); *Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040, at *2

district court in *Washington v. Trump* issued a nationwide injunction against the order, finding that the plaintiffs had "shown that they are likely to succeed on the merits of the[ir] claims" that the order was unlawful. 2017 WL 462040, at *2.

The Government appealed the *Washington* district court's order and sought an emergency stay pending appeal. On February 9, the Court of Appeals denied the stay request, finding that the Government had not "shown a likelihood of success on the merits of its appeal." *Washington v. Trump*, 847 F.3d 1151, 1156 (9th Cir. 2017) (per curiam). Specifically, the court held that the Government had not established that the January 27 executive order satisfied the Due Process Clause because it did not "provide[] what due process requires, such as notice and a hearing prior to restricting an individual's ability to travel." *Id.* at 1164. The court also held that the plaintiffs' claims that the executive order violated the Establishment and Equal Protection Clauses "present[ed] significant constitutional questions" in light of "numerous statements by the President about his intent to implement a 'Muslim ban' as well as evidence [plaintiffs] claim suggests that the Executive Order was intended to be that ban." *Id.* at 1167–68.

On February 13, Plaintiff filed the instant lawsuit, seeking to permanently enjoin enforcement of the January 27 order because the nationwide TRO entered by the court in *Washington* was temporary; Plaintiff could not be sure that it would be sustained on appeal, given that the Government was challenging the *Washington* plaintiffs' standing to sue; and, based on information received from the Government, Plaintiff believed the Government was not processing his petitions notwithstanding the *Washington* injunction. In response to Plaintiff's motion for a temporary restraining order, preliminary injunction, and summary judgment in this

---

(W.D. Wash. Feb. 3, 2017); *Aziz v. Trump*, No. 1:17-cv-116 (LMB/TCB), 2017 WL 580855, at *7–10 (E.D. Va. Feb. 13, 2017).

case, the Government represented that it had stopped processing derivative asylum petitions once President Trump signed the January 27 order but had resumed processing such petitions (including Plaintiff's) following the *Washington* injunction. The Government also represented that President Trump would be signing a revised executive order promptly. Defs.' Response to Court's Order, Feb. 17, 2017, Dkt. No. 23. As a result of these representations, Plaintiff withdrew his request for a temporary restraining order, and the Court denied as moot Plaintiff's other requests without prejudice. Order, Feb. 17, 2017, Dkt. No. 25.

On February 24, Plaintiff received notice from USCIS that its Nebraska processing center had completed its review of his petitions. USCIS represented that it would transfer his petitions to the National Visa Center for processing at the U.S. Embassy in Amman, Jordan. Plaintiff's wife and daughter will then have to undergo an interview in Amman, be approved for visas, and arrange to travel to the United States.

## D.     President Trump Replaces the January 27 Executive Order with the New Executive Order

Soon after Plaintiff received the good news from USCIS, President Trump revived his efforts to ban the entry of Syrians, including Plaintiff's wife and child, by signing Executive Order 13780. The Executive Order, which goes into effect on March 16, is a repeat of the January 27 order in both purpose and effect. It is titled "Protecting the Nation from Foreign Terrorist Entry into the United States" — the same name as the January 27 order. Like the January 27 order, it bars for a renewed period of ninety days the entry of all nationals of six Muslim-majority countries, including Syria, ostensibly while the Government studies potential improvements to vetting procedures. (Unlike the January 27 order, it does not bar entry from Iraq.) *Id.* § 2(c). Entry from the affected countries may be prohibited beyond the ninety-day period if the countries do not provide the United States certain information about their nationals.

8

*Id.* § 3(e).  And while the Executive Order no longer indefinitely bars entry by Syrian refugees, it

suspends USRAP for 120 days, just like the January 27 order.  *Id.* § 6(a).  It also purports to limit

the number of refugees the United States will accept in 2017 to 50,000.  *Id.* § 6(b).

As the text and context of the Executive Order establish, it was intended to replicate the

January 27 order as closely as possible.  In a television interview on February 22, White House

senior advisor Stephen Miller confirmed that the revised Executive Order (which was then in the

works) would contain "mostly minor, technical differences" from the January 27 order, designed

to "be responsive" to "flawed, erroneous and false" court orders.  "Fundamentally," Miller said,

"you are still going to have the same, basic policy outcome for the country."  Second

Breidenbach Decl. ¶ 6.  And in a press briefing held on March 6, 2017 following the signing of

the Executive Order, President Trump's press secretary emphasized that the "principles of the

[new] executive order remain the same."  Second Breidenbach Decl. ¶ 13.

If anything, it became even clearer between January 27 and March 6 that the Executive

Order's purported national-security justification was a pretext designed to obscure the Order's

true anti-Muslim motivations.  Despite claiming that the nation's security was at risk, the

Administration delayed signing the Executive Order on March 1 because doing so would have

detracted from favorable media coverage for the President.  Second Breidenbach Decl. ¶ 9 ("We

want the [executive order] to have its own 'moment.'").  Shortly thereafter, two separate reports

by the Department of Homeland Security concluded that a territory-based immigration ban did

not further the Executive Order's ostensible national-security goals.  Second Breidenbach Decl.

¶¶ 7, 8.  Far from being an urgent matter of national security, a White House official revealed on

March 5 that discussions about the Executive Order were motivated at least in part by a desire to

put the President "in a better mood."  Second Breidenbach Decl. Ex. NN.  And, within moments

of signing the Executive Order, President Trump sent a fundraising email asserting that the Executive Order targets "radical Islamic terrorism," as he had promised to do during his campaign. Second Breidenbach Decl. Ex. QQ (stating that the Executive Order embodies "policies [President Trump's supporters] voted for").

### E. The Executive Order Separates Plaintiff from His Wife and Daughter

The Executive Order, once it becomes effective, will immediately put a stop to Plaintiff's derivative asylum petitions. Although USCIS has concluded its review and is in the process of transferring Plaintiff's petitions to the embassy in Amman, the petitions have not yet been finally approved. For that reason, the Executive Order's exception for non-citizens "who ha[ve] been granted asylum," Exec. Order §§ 3(b)(vi), 12(e), does not apply to Plaintiff's wife and daughter, who still need to undergo visa interviews, be approved for visas, travel to the United States, and be granted admission by a customs officer, *see id.* § 3(a) (Order applies to foreign nationals who "are outside the United States" and "do not have a valid visa" by March 16).

Section 2(c) of the Executive Order bars at least the last three of those steps. But the Government may well stop processing Plaintiff's petitions altogether. The operative provisions of the Executive Order are the same as in the January 27 order, which the Government said halted the processing of derivative asylum petitions like those filed for Plaintiff's wife and child. Defs.' Response to Court's Order, Feb. 17, 2017, Dkt. No. 23. Available guidance from the Government states that I-730 derivative asylum petitions do not benefit from exceptions under the Order. Second Breidenbach Decl. ¶ 15. And, finally, the Government has not substantively responded to multiple emails and voicemails requesting a representation about the Executive Order's effect on Plaintiff's petitions, indicating that the Order affects his petitions. Thus, as a direct result of the Executive Order, and despite the obvious merit of Plaintiff's derivative

asylum petitions, Plaintiff is separated from his wife and daughter, who face grave danger in Syria.

## ARGUMENT

The Court should grant a temporary restraining order and/or preliminary injunction prohibiting the Government from relying on the Executive Order to delay or deny Plaintiff's derivative asylum petitions. To obtain temporary or preliminary injunctive relief, the moving party must demonstrate (1) "some likelihood of success on the merits," (2) no adequate remedy at law, (3) irreparable harm in the absence of the injunction, and (4) a balance of the equities in his favor. *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012).[3] The "more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (internal quotation marks omitted).

Here, Plaintiff is highly likely to succeed on the merits of his claim. Just like the January 27 order, the Executive Order is unlawful for multiple reasons: (1) it exceeds the President's authority under the INA; (2) it violates Plaintiff's fundamental right to family integrity and thus violates his substantive and procedural due process rights; (3) it discriminates against Plaintiff on the basis of religion, in violation of the Establishment Clause and the Fifth Amendment's guarantee of Equal Protection; and (4) it discriminates against Plaintiff on the basis of national origin, also in violation of Equal Protection. Moreover, Plaintiff will suffer irreparable harm if the Order is not enjoined, and the equities tilt squarely in his favor.

---

[3]     The standards for a temporary restraining order and a preliminary injunction are the same. *Winnig v. Sellen*, 731 F. Supp. 2d 855, 856 (W.D. Wis. 2010).

# I.   PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIM

## A.   THE EXECUTIVE ORDER VIOLATES THE INA

In issuing the Executive Order, the President expressly invoked his authority under Sections 212(f) and 215(a) of the INA, 8 U.S.C. §§ 1182(f), 1185(a).[4]  But those sections do not authorize the President to suspend entry of all Syrians, as the text and structure of the INA make apparent.  *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2090 (2015) ("The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue.").

**1.**  To begin with, by temporarily halting the issuance of visas for Syrians, the Executive Order violates Section 202(a)(1)(A) of the INA, which prohibits discrimination based on nationality in the issuance of immigrant visas:

> Except as specifically provided in paragraph (2) and in sections 1101(a)(27), 1151(b)(2)(A)(i), and 1153 of this title, no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence.

8 U.S.C. § 1152(a)(1)(A).  This section "unambiguously direct[s] that no nationality-based discrimination shall occur."  *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 473 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996).  The Executive Order plainly violates that requirement because, as the Seventh Circuit recently held, "targeting

---

[4]     Section 212(f) provides, in relevant part: "Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."  Section 212(a)(1) provides: "[I]t shall be unlawful . . . for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe."

Syrian refugees is discrimination on the basis of nationality." *Exodus Refugee Immigration, Inc. v. Pence*, 838 F.3d 902, 905 (7th Cir. 2016).

Sections 212(f) and 215(a) do not permit the President to disregard Section 202(a)(1)(A)'s antidiscrimination rule. It is well established that "[a] specific statute takes precedence over a more general statute, and a later enacted statute may limit the scope of an earlier statute." *Bhd. of Maint. of Way Emps. v. CSX Transp., Inc.*, 478 F.3d 814, 817 (7th Cir. 2007). That is the case here; Section 202(a)(1)(A) was enacted in 1965, thirteen years after Sections 212(f) and 215(a). *See* INA of 1965, Pub. L. 89-236, § 2, 79 Stat. 911, 911 (1965); INA of 1952, Pub. L. 82-414, §§ 212(e), 215(a), 66 Stat. 163, 188, 190 (1952). And Section 202(a)(1)(A) by its plain terms applies "[e]xcept as specifically provided" in four identified provisions of the INA — none of which is Section 212(f) or Section 215(a). 8 U.S.C. § 1152(a)(1)(A). Where, as here, "Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied." *Hillman v. Maretta*, 133 S. Ct. 1943, 1953 (2013) (internal quotation marks omitted). Because Section 202(a)(1)(A)'s antidiscrimination mandate does not include Sections 212(f) or 215(a) in its list of exceptions, it limits the President's authority under those sections. The President may not use Sections 212(f) or 215(a) to suspend the issuance of visas for a given nationality.

Section 202(a)(1)(A)'s legislative history confirms the point. Before 1965, U.S. immigration was governed by the "national origins system." H.R. Rep. No. 89-745, at 8 (1965) (Breidenbach Decl. Ex. Y). Designed "to maintain the ethnic balance of the American population as it existed in 1920," the national origins system created immigration quotas "based upon race and place of birth." *Id.* at 10. By 1965, however, it was clear that the national origins system, which "impl[ied] that men and women from some countries are, just because of where

they come from, more desirable citizens than others," was "incompatible with our basic American tradition." *Id.* at 11. In 1965, Congress thus passed amendments to the INA, the "primary objective" of which was to "abolish[] . . . the national origins quota system" and replace it with "a new system of selection." S. Rep. No. 89-748, at 11, 13 (1965) (Breidenbach Decl. Ex. Z); *see* H.R. Rep. No. 89-745, at 18. This new system, "designed to be fair, rational, humane, and in the national interest," would select immigrants "without regard to place of birth." H.R. Rep. No. 89-745, at 12; *see* S. Rep. No. 89-748, at 13–14.

Section 202(a)(1)(A) was central to achieving the 1965 Act's antidiscrimination goals. *See Olsen v. Albright*, 990 F. Supp. 31, 37 (D.D.C. 1997). By "flatly forbidding nationality-based discrimination," *Vietnamese Asylum Seekers*, 45 F.3d at 473, Section 202(a)(1)(A) ensured that the United States would never again close its borders to immigrants based solely on nationality. As President Johnson put it in a signing ceremony before the Statue of Liberty, "for over four decades the immigration policy of the United States ha[d] been twisted and . . . distorted by the harsh injustice of the national origins quota system." The 1965 Act corrected this "cruel and enduring wrong in the conduct of the American Nation." Breidenbach Decl. Ex. AA. In contravention of Congress's mandate, President Trump has sought to repeat what President Johnson called a "harsh injustice."

**2.** More generally, the President's reading of Sections 212(f) and 215(a) to permit him to suspend all refugee petitions and entry of all Syrians is inconsistent with the statutory scheme. Congress's guarantee of fairness and equality in matters of immigration would be a dead letter if Sections 212(f) or 215(a) permitted the President to override the carefully calibrated legislative scheme on the mere invocation of the "national interest." More than that, the Government's

interpretation of Sections 212(f) and 215(a) would allow the President to single-handedly dismantle the entire body of immigration and refugee law that Congress created.

Particularly relevant here is Congress's decision in the INA to impose precise requirements, procedures, quotas, and priorities for immigrant visas, *see* 8 U.S.C. §§ 1152–53, and admissions for refugees and asylees, *see id.* §§ 1157–58. If the President wishes to alter the number of refugees the United States will accept, he may do so only after "appropriate consultation" with Congress — a statutory term defined to mean meeting "with members of the Committees on the Judiciary of the Senate and of the House of Representatives to review the refugee situation" and "to discuss" certain matters specified by statute. *Id.* § 1157(a)(2), (b), (e).[5] Sections 6(a) and 6(b) of the Executive Order, which unilaterally suspend USRAP and purport to cap the number of refugees that may enter the United States without undertaking the "consultation" the INA requires, are proof positive that the Government's reading of Section 212(f) would render the rest of the INA a nullity.

Similarly, Congress required "final administrative adjudication" of asylum applications to "be completed within 180 days after the date an application is filed." 8 U.S.C. § 1158(d)(5)(A)(iii). To add other "conditions or limitations," the Attorney General — not the President — must promulgate regulations (following notice and comment) that are "not inconsistent" with the INA. *Id.* § 1158(d)(5)(B). And the INA includes a number of provisions designed to favor family reunification in the application and processing of immigration matters.

---

[5]    Earlier in this litigation, the Government took the position that the January 27 order's suspension of USRAP for 120 days did not apply to Plaintiff's derivative asylum petitions. Defs.' Response to the Court's Order 2 n.1, Feb. 17, 2017, Dkt. No. 23. But to the extent that is no longer true under Section 6(a) of the new Executive Order, that section also exceeds the President's power. Sections 212(f) and 215(a), which govern the "entry" of aliens, do not empower the President to unilaterally suspend USRAP. Tellingly, Section 6(a) does not cite Section 212(f), Section 215(a), or any other statute providing the President with that power.

*See id.* §§ 1101(a)(27), 1153(a)–(e), 1154(a); S. Rep. No. 89-748, at 13 ("Reunification of families is to be the foremost consideration.").  These provisions reflect not just a considered judgment by Congress to support family relations, but are also necessary for the United States to honor its obligations under international law.  *See* DHS, Annual Flow Report, Refugees and Asylees: 2005 (Breidenbach Decl. Ex. BB) ("U.S. asylum policy is governed by the Refugee Act of 1980.  The Refugee Act established a statutory process for granting asylum consistent with the 1951 Convention Relating to the Status of Refugees.").[6]

Congress could not have intended these and countless other detailed provisions to be mere suggestions that the President could override through unreviewable executive fiat by simply proclaiming that the "national interest" is different than what Congress enacted in the INA.  As Justice Scalia colorfully explained for a unanimous Supreme Court, Congress does not "hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000) (holding Congress did not intend to permit the FDA to regulate tobacco by granting it the authority to regulate "drugs").  The INA should not be "interpret[ed] … to negate [its] own stated purposes."  *N.Y. State Dep't of Soc. Servs. v. Dublino,* 413 U.S. 405, 419–20 (1973).

The unchecked Presidential authority the Government reads into Sections 212(f) and 215(a) raises serious Article II concerns, since the Executive cannot "'consciously and expressly adopt[] a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities."  *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985).  Indeed, Presidents have

---

[6]     *See* Final Act of the 1951 U.N. Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, Recommendation B (Breidenbach Decl. Ex. CC) (declaring that "the unity of the family . . . is an essential right of the refugee" and calling upon governments to "take the necessary measures for the protection of the refugee's family").

never before understood their authority under Sections 212(f) or 215(a) to be unlimited in the way the Government now claims. In the long history of presidential proclamations based on those sections, not one has categorically excluded all aliens from a particular nation — until now. *See* Breidenbach Decl. Ex. J at 6–10; *see also* Breidenbach Decl. Ex. X ¶ 8.[7] The "lack of historical precedent" for the Executive Order is a "telling indication" that it is unlawful. *Luis v. United States*, 136 S. Ct. 1083, 1099 (2016) (internal quotation mark omitted).

The Executive Order, insofar as it bars Syrians entry into the United States, should be set aside, and Defendants should be ordered to consider Plaintiff's derivative petitions consistent with the INA.

## B. THE EXECUTIVE ORDER UNLAWFULLY INTERFERES WITH PLAINTIFF'S FUNDAMENTAL RIGHT TO FAMILY INTEGRITY, IN VIOLATION OF DUE PROCESS

Even if the Executive Order could be justified on statutory grounds as a valid exercise of authority under the INA, it would still be unlawful because, in suspending Plaintiff's derivative petitions and barring entry of Syrians, it violates the Fifth Amendment's guarantee of due process. The Executive Order violates both substantive and procedural due process because it unfairly deprives Plaintiff of his fundamental right to family integrity without adequate justification or procedures.

**1.** As the Supreme Court long ago explained, the Fifth Amendment's prohibition of deprivations of liberty without due process protects "not merely freedom from bodily restraint

---

[7]     President Reagan did issue a proclamation excluding many Cuban nationals, but that proclamation did not categorically exclude Cubans as immigrants and did not exclude them as nonimmigrants at all. Pres. Proc. No. 5517 (Aug. 22, 1986). It was also a direct response to Cuba's suspension of immigration between Cuba and the United States. *Id.* It thus provides no support for the Executive Order, which categorically excludes aliens from six different nations as immigrants and nonimmigrants based on nothing more than a generalized and unsupported assertion of risk.

but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

Consistent with that observation, the Supreme Court has since explained that the Due Process Clause protects against unwarranted governmental interference with numerous aspects of the marital relationship. *See Griswold v. Connecticut*, 381 U.S. 479, 485–86 (1965) (right of married couples to contraception); *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (right to marry); *Obergefell v. Hodges*, 135 S. Ct. 2584, 2599 (2015) (right to same-sex marriage). It also protects against interferences with the right to rear children: "[T]he right of parents to 'establish a home and bring up children' and 'to control the education of their own'" is "perhaps the oldest of the fundamental liberty interests recognized by th[e] [Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see Meyer*, 262 U.S. at 402–03 (recognizing right of parents to have their child learn the German language); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925) (recognizing fundamental right "of parents and guardians to direct the upbringing and education of children under their control").

These cases and others establish that the Due Process Clause provides heightened protection against government interference with the integrity of the unitary family. Government conduct that interferes with this fundamental right must be narrowly tailored to further a compelling government interest. *E.g.*, *Zablocki v. Redhail*, 434 U.S. 374, 368 (1978); *Moore v. City of E. Cleveland*, 431 U.S. 494, 500 (1977); *see also Brokaw v. Mercer Cty.*, 235 F.3d 1000,

1018–19 (7th Cir. 2000) (collecting cases recognizing the "constitutional right to familial relations").

**2.**   The Executive Order contravenes the Due Process Clause's prohibition against unwarranted governmental intrusions with the "constitutional right to familial relations." *Brokaw*, 235 F.3d at 1018.  It interferes with Plaintiff's fundamental right to family integrity by making it impossible for him to reunite with his wife and young child.  Moreover, Plaintiff cannot return to them without facing further torture and likely death, as the Government found in granting him asylum.

To interfere with Plaintiff's fundamental right to family integrity in this way, the Executive Order must be narrowly tailored to advance a compelling state interest.  *See, e.g.*, *Zablocki*, 434 U.S. at 368.  But the Executive Order flunks that test because it is both over- *and* under-inclusive in achieving its purported justification of protecting against the entry of terrorists.  The Executive Order is *over*-inclusive because it ensnares immigrants with no possible connection to terrorism.  Plaintiff's daughter is a case in point: the Executive Order here serves only to protect America from the non-existent threat of a sick three-year-old girl entering the country to be reunited with her father.  As one court put it, "[i]t is beyond reasonable argument to contend that a policy that purportedly deters [Syrian] four year olds from resettling . . . is narrowly tailored to serve the . . . asserted interest in public safety."  *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 737 (S.D. Ind.), *aff'd*, 838 F.3d 902 (7th Cir. 2016).

The Executive Order is also drastically *under*-inclusive.  As the Seventh Circuit explained recently in *Pence*, "no Syrian refugees have been arrested or prosecuted for terrorist acts or attempts in the United States."  838 F.3d at 904.  Nor have any fatal terrorist attacks been

19

committed in the United States by a national of any of the six countries covered by Section 2(c) in at least the past quarter-century. *See* Breidenbach Decl. Exs. K, S. Conversely, nationals from other countries *not* subject to the Executive Order have perpetrated fatal attacks in the United States in the last two decades. *Id.* None of the perpetrators of the September 11th, Boston Marathon, San Bernardino, or Orlando attacks came from Syria or any of the other five affected countries.

In fact, in two separate internal memoranda written between President Trump's two executive orders, the Department of Homeland Security concluded that the Executive Order would not materially advance the Government's national-security interests. DHS concluded that "most foreign-born, US-based violent extremists likely radicalized several years after their entry to the United States, limiting the ability of screening and vetting officials to prevent their entry because of national security concerns." Second Breidenbach Decl. ¶ 8. Even if extremists could be identified and screened before entry, the Executive Order's focus on nationality would be inapt because, as DHS explained, "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity." Second Breidenbach Decl. ¶ 7. Indeed, of the eighty-two U.S. residents DHS identified as having been involved in terrorism-related offenses since the beginning of the Syrian conflict, *not one* came from Syria. *Id.*

In light of the feeble national-security justification for the Executive Order, the Government has argued in cases challenging the January 27 order that its justifications must only be "facially legitimate and bona fide" where immigration is at stake. *Fiallo v. Bell*, 430 U.S. 787, 807 (1977); *Kleindienst v. Mandel,* 408 U.S. 753, 770 (1972). But, as the Ninth Circuit recently held in rejecting this argument, that more limited standard of review applies only to "lawsuits challenging an executive branch official's decision to issue or deny an individual visa

based on the application of a congressionally enumerated standard to the particular facts presented by that visa application," not to all executive exercises of immigration authority. *Trump*, 847 F.3d at 1162; *see also Fiallo*, 430 U.S. at 797–98 (challenging statutory scheme setting out special preference immigration status to aliens who qualify as the "children" or "parents" of United States citizens or lawful permanent residents). *Mandel*'s deferential standard of review, tailored to individual exercises of Executive discretion authorized by pre-existing law, is ill-equipped to account for the myriad interests implicated by the sweeping, unprecedented Executive Order. *Trump*, 847 F.3d at 1162–63.[8] *Mandel* provides no basis to override nearly a century of cases protecting the fundamental rights of persons in the United States from unwarranted incursions into the familial unit.

**3.** The Executive Order also violates the Due Process Clause because it deprives Plaintiff of adequate procedures. *See United States v. Salerno*, 481 U.S. 739, 746 (1987) ("When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner." (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976))). Plaintiff's procedural due process right in his derivative asylum petitions is directly implicated by his fundamental liberty interest in family integrity. *Cf. Bustamante v. Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008) (joining the First, Second, and D.C. Circuits to

---

[8]    In any event, the Executive Order cannot pass muster even under the *Mandel* test. "[P]rotecting the nation from foreign terrorist entry" is a facially legitimate reason to exclude certain classes of aliens. But there is overwhelming evidence that the real reason for the Executive Order is anti-Muslim animus. *See infra* at 25–26. Therefore, Defendants' asserted justification for the Executive Order is not *bona fide* and cannot stand. *See Wong Wing Hang v. INS*, 360 F.2d 715, 719 (2d Cir. 1966) (Friendly, J.) (executive immigration decisions cannot rest on "invidious discrimination against a particular race or group").

hold that a U.S. citizen raising a constitutional challenge to the denial of a visa to her husband is entitled to a limited judicial inquiry regarding the reason for the decision).[9]

There are three general factors that courts weigh to determine whether the process at issue is constitutional: (1) the private interest affected by the official actions; (2) the risk of an erroneous deprivation of the interest and the value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the fiscal and administrative burdens the additional or substitute procedural requirements would impose. *Eldridge*, 424 U.S. at 335.[10] Whatever process is due here, however, the Executive Order does not provide it — it provides no process at all, as the Ninth Circuit recently observed in denying the Government's motion for a temporary stay. *See Trump*, 847 F.3d at 1164 ("[T]he Government does not contend that the Order provides for such process."). Accordingly, the Executive Order, as applied to Plaintiff's pending petitions for derivative asylum, violates Plaintiff's procedural due process rights.

---

[9]     Four members of the Supreme Court recently agreed with this rule in *Kerry v. Din*, 135 S. Ct. 2128, 2142 (2015) (Breyer, J., dissenting). In *Din*, Justices Kennedy and Alito found it unnecessary to decide whether there was such a right because they believed the government had granted adequate process under the circumstances of the case.

[10]     Defendants have never explained why existing procedures are inadequate to consider pending derivative asylum petitions. Refugees and asylees are already subject to "the highest level of background and security checks of any category of traveler to the United States," in a process that often takes years to complete, and Syrian applicants are subject to "enhanced review." Breidenbach Decl. Ex. DD. Indeed, the Executive Order is likely to undermine U.S. national security interests. *See* Breidenbach Decl. Ex. X (Joint Declaration of Madeleine K. Albright et al., *Trump*, No. 17-35105) (detailing how the Executive Order will endanger U.S. troops and intelligence sources; disrupt key counterterrorism, foreign policy, and national-security partnerships; and "feed the recruitment narrative of ISIL and other extremists that portray the United States as at war with Islam").

**C. THE EXECUTIVE ORDER VIOLATES THE ESTABLISHMENT CLAUSE AND EQUAL PROTECTION BY DISPROPORTIONATELY BURDENING MUSLIMS BASED ON ANTI-MUSLIM ANIMUS**

The Executive Order also violates the Establishment Clause and the Fifth Amendment's guarantee of Equal Protection because it does what it was intended to do: disfavor Islam.[11] The Establishment Clause's "clearest command" is that "one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). "This prohibition is absolute." *Id.* at 246. Even a facially neutral law violates the Establishment Clause when it "(1) lacks a legitimate secular purpose; (2) has the primary effect of advancing or inhibiting religion; or (3) fosters an excessive entanglement with religion." *Doe ex rel. Doe v. Elmbrook School Dist.*, 687 F.3d 840, 849 (7th Cir. 2012) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971)); *see also School Dist. of Abingdon Twp. v. Schemp*, 374 U.S. 203, 222 (1963) ("The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution."). Similarly, the Fifth Amendment's Equal Protection guarantee forbids facially neutral laws that have a "disproportionately adverse effect" on a suspect class, including a religious denomination, if the "impact can be traced to a discriminatory purpose." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979); *see Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006).

---

[11] Plaintiff's Establishment Clause claim is materially distinct from the claim found unlikely to succeed for lack of standing in *Louhghalam v. Trump*, No. 17-cv-10154, 2017 WL 479779, at *4–5 (D. Mass. Feb. 3, 2017). Unlike the *Louhghalam* plaintiffs, Plaintiff is already in the United States and is seeking admission for his family; the Executive Order thus directly affects his right to live with his wife and daughter. Plaintiff plainly has standing to enforce his own constitutional rights.

To determine whether a facially neutral law unconstitutionally burdens a religion or otherwise violates the Establishment Clause, a court should ask how a reasonable observer would understand the law in light of its context. *See McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 865–66 (2005). The Court may thus consider "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Church of Lukami Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993); *see Trump*, 847 F.3d at 1167 ("[I]t is well established that evidence of purpose beyond the face of the challenged law may be considered in evaluating Establishment and Equal Protection Clause claims."). When "openly available data support[s] a commonsense conclusion that a religious objective permeated the government's action," it is unconstitutional. *McCreary*, 545 U.S. at 863; *see also Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265–66 (1977) ("When there is a proof that a discriminatory purpose has been a motivating factor in the decision, … judicial deference [to the political process] is no longer justified.").

Here, the Executive Order violates the Establishment Clause and the Fifth Amendment's Equal Protection guarantee because it has the purpose and effect of disfavoring Muslims. *See Aziz*, 2017 WL 580855, at *7–9 (finding the January 27 order likely violated the Establishment Clause). Section 2(c) of the Executive Order self-evidently burdens Muslims more harshly than any other religious group by barring entry from exclusively Muslim-majority countries. *See Larson*, 456 U.S. at 254 (holding the government may not impose "burdens . . . upon particular denominations").

This disparate impact on Muslims is no accident; it is the Executive Order's intended effect, the culmination of a public history of animus toward Muslims. As a candidate, President Trump expressed hostility toward Muslims and pledged — loudly and repeatedly — to ban them from entering the United States. *See* Breidenbach Decl. ¶¶ 2–8; *Trump*, 847 F.3d at 1167 (citing "numerous statements by the President about his intent to implement a 'Muslim ban' as well as evidence . . . that the Executive Order was intended to be that ban"); *Aziz*, 2017 WL 580855, at *8–9 (summarizing the President's anti-Muslim animus). The January 27 executive order was his attempt to enact his promised Muslim ban. Breidenbach Decl. ¶ 18. That order facially discriminated on the basis of religion by barring entry from Muslim-majority countries while simultaneously prioritizing members of the "minority religion in the individual's country of nationality." Jan. 27 Order §§ 3(c), 5(b), 5(e). And President Trump made clear that the order was intended to favor Christians at the expense of Muslims. *See* Breidenbach Decl. ¶ 14 ("[W]e are going to help [Christians].").

This history, which is further detailed in the accompanying affidavits, fatally infects the new Executive Order. As the White House has admitted, the Executive Order was intended to and does replace the January 27 order without altering its governing "policy" or "principles" in any way. Second Breidenbach Decl. ¶¶ 6, 13. What speaks volumes here is the fact that the Department of Homeland Security was tasked with bolstering the Executive Order's national-security justification and came up empty-handed on not one but two occasions, concluding that "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity." Second Breidenbach Decl. ¶ 7. If the Executive Order's real goal was to facilitate a study of vetting procedures, the Government presumably would have channeled its resources toward that objective rather than manufacturing post-hoc justifications for the President's anti-Muslim

campaign promises.  But there is no indication that the Government has made any progress in that respect, given that the new order, which goes into effect forty-eight days after President Trump first called for the Government to conduct a ninety-day study — more than halfway into the original time period — starts the ninety-day clock anew.

In sum, the Executive Order follows from the same expressions of anti-Muslim animus as the January 27 order, and its bar on entry from Muslim-majority countries disproportionately burdens Muslims in precisely the same way.  As such, the Executive Order's representation that it does not target Muslims, *see* Exec. Order § 1(b)(iv), is a litigation-driven "sham" undeserving of judicial respect, *McCreary*, 545 U.S. at 844; *see Aziz*, 2017 WL 580855, at *8 n.10 (disregarding "post hoc statements . . . that this is not a Muslim ban" because "[s]uch rationalizations . . . are typically afforded little weight in an intent inquiry").  As the Supreme Court has explained, "the world is not made brand new every morning," and courts may not "turn a blind eye to the context in which [a] policy arose."  *McCreary*, 545 U.S. 844 at 866 (internal quotation mark omitted).  Here, the Executive Order's history makes clear that it was intended to do exactly what it does: discriminate against Muslims.  It therefore violates the Establishment Clause and Equal Protection and should be enjoined.

**D.     THE EXECUTIVE ORDER UNCONSTITUTIONALLY DISCRIMINATES ON THE BASIS OF NATIONALITY**

When confronted with the fact that a religion-based "Muslim ban" is unconstitutional, then-candidate Trump tried to pivot by characterizing his proposal as a ban that discriminates on the basis of "territory" or national origin, responding flippantly: "So you call it territories, ok? We're gonna do territories.  We're gonna not let people come in from Syria."  Breidenbach Decl. ¶ EE.  Even looking past the fact that this was a change in name only, and is certainly not bona fide, this pivot from religion to nationality did nothing to alter the policy's unconstitutionality.

Indeed, classifications based on national origin are also inherently suspect and subject to strict scrutiny. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

There can be no question that the Executive Order facially discriminates on the basis of national origin by barring all entry for non-citizens from Syria and five other identified countries. Exec. Order § 2(c). As the Seventh Circuit recently recognized in invalidating then-Governor (now-Vice President) Pence's denial of federal resettlement funds for Syrian refugees, such distinctions are illegal "discrimination on the basis of nationality." *Pence*, 838 F.3d at 904. Writing for the Court of Appeals, Judge Posner did not mince words:

> [In defending the order, Pence] argues that his policy of excluding Syrian refugees is based not on nationality and thus is not discriminatory, but is based solely on the threat he thinks they pose to the safety of residents of Indiana. But that's the equivalent of his saying (not that he does say) that he wants to forbid black people to settle in Indiana not because they're black but because he's afraid of them, and since race is therefore not his motive he isn't discriminating. But that of course would be racial discrimination, just as his targeting Syrian refugees is discrimination on the basis of nationality.

*Id.* at 904–05. So too here.

And because the Executive Order discriminates on the basis of national origin, it must satisfy strict scrutiny. But defendants can offer no compelling government interest to justify such blatant discrimination. Even if the Court were to accept the Executive Order's purported national-security justification — and, under the Seventh Circuit's decision in *Pence*, the Court could not — the Executive Order is, as previously explained, not narrowly tailored to advance that interest. It is both over- and under-inclusive, depriving all sorts of persons from entry into the United States regardless of their relationship to terrorism, such as Plaintiff's wife and three-year-old daughter. *See supra* at 19–20.

Even a lesser level of scrutiny would not change this conclusion. "The Constitution's guarantee of equality 'must at the very least mean that a bare . . . desire to harm a politically

27

unpopular group cannot' justify disparate treatment of that group." *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534–35 (1973)). The "sheer breadth" of the Executive Order — barring all Syrians — is "so discontinuous with the reasons offered for it" — protecting the nation from terrorist entry — "that [it] seems inexplicable by anything but animus toward the class it affects." *Romer v. Evans*, 517 U.S. 620, 632 (1996). The Executive Order thus lacks even "a rational relationship to legitimate state interests." *Id.*

### E. THE GOVERNMENT CANNOT JUSTIFY THE EXECUTIVE ORDER BASED ON SO-CALLED PRESIDENTIAL POWERS

In cases challenging the January 27 order, the Government took the position that the Executive Order, however unlawful or unconstitutional it might be in other contexts, is nevertheless a valid — and unreviewable — exercise of the President's power over foreign affairs. Not so.

"Under Article 1, Section 8 of the United States Constitution, *Congress* is empowered to establish standards for immigration." *United States v. Tittjung*, 235 F.3d 330, 338 (7th Cir. 2000) (emphasis added). To be sure, the President receives a large degree of deference on matters concerning immigration and national security. But the President may not suspend constitutional or statutory mandates, even in the immigration and national-security context. *See, e.g.*, *id.* ("[T]he fact that Congress delegated authority to the Executive to oversee matters of immigration does not mean that the Attorney General was provided with exclusive control for the entire area."); *Zivotofsky*, 135 S. Ct. at 2090 ("The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue."); *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (plurality opinion). And, "in time of war as well as in time of peace," the Judiciary has a duty "to preserve unimpaired the constitutional safeguards of civil

liberty." *Ex parte Quirin*, 317 U.S. 1, 19 (1942); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582–83, 590 (1952) (holding the President may not seize the nation's steel mills merely by proclamation, even upon finding that such a seizure "was necessary to avert a national catastrophe," and even where steel was "an indispensable component of substantially all . . . weapons and other materials" necessary for the United States in an ongoing war).

The President's Article II authority cannot abridge Article I or the Bill of Rights. Nor can the Executive's so-called "plenary powers" be used to rewrite U.S. law in order to fulfill a campaign promise of banning Muslims from the United States. Simply put, the new Executive Order is illegal. As with the one that it replaced, it should be enjoined to protect Plaintiff's interest in reuniting with his wife and three-year-old daughter.

## II. PLAINTIFF STANDS TO SUFFER IRREPARABLE INJURY, AND THE EQUITIES STRONGLY TILT IN HIS FAVOR

Next, it is clear that Plaintiff satisfies the rest of the test for obtaining a temporary restraining order or preliminary injunction, given the immediate threat to him and his wife and young child.

As a general matter, the mere establishment of a constitutional violation of the sort at issue here establishes both irreparable injury and that the balance of the equities supports entry of an injunction. Constitutional violations are presumed to result in irreparable harm. *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).[12] Similarly, it is "always in the public interest" to enjoin unconstitutional conduct. *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir.

---

[12]     *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (First Amendment); *Preston v. Thompson*, 589 F.2d 300, 303 (7th Cir. 1978); *Milwaukee Cty. Pavers Ass'n v. Fiedler*, 707 F. Supp. 1016, 1032 (W.D. Wis.), *modified*, 710 F. Supp. 1532 (W.D. Wis. 1989) (equal protection); *Jessen v. Vill. of Lyndon Station*, 519 F. Supp. 1183, 1189 (W.D. Wis. 1981) (equal protection, due process, and First Amendment).

2004) (internal quotation marks omitted); *see also Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) (stating that remedying a "continuing constitutional violation . . . certainly would serve the public interest"). Given Plaintiff's strong showing on the merits, the Court should enter immediate relief now to preserve the status quo.

But this case presents a particularly pronounced showing that immediate injunctive relief is warranted. As courts in this and other Circuits have recognized, separation from one's wife and child constitutes irreparable harm.[13] Plaintiff has not seen his wife in three years. He has not experienced any of the crucial "firsts" in his daughter's life: her first smile, her first steps, her first words. He could not be with his family to bury and mourn his son; he must grieve alone. And Aleppo remains a humanitarian disaster. Its residents, including Plaintiff's family, lack access to adequate food, shelter, and other basic services. Plaintiff's daughter is ill without access to basic medical care. The SAA, whose members threatened to rape Plaintiff's wife, is still active and in control of the neighborhood where she remains in hiding, too terrified to risk going outside absent an emergency. As long as the Executive Order is in effect, Plaintiff will live every day not knowing if he will ever see his family again. His injury is not subject to serious dispute.[14]

---

[13]   *E.g.*, *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011); *Andreiu v. Ashcroft*, 253 F.3d 477, 484 (9th Cir. 2001) (en banc); *Ramirez-Vicario v. Achim*, No. 04 C 0301, 2004 WL 392573, at *3 (N.D. Ill. Feb. 24, 2004); *Omar v. Kerry*, No. 15-CV-01760-JSC, 2015 WL 5964901, at *9 (N.D. Cal. Oct. 13, 2015); *Ping Ping Zhou v. Kane*, No. CV 07-0785-PHX-DGC (ECV), 2007 WL 1559938, at *4 (D. Ariz. May 29, 2007).

[14]   The potential availability of a waiver from the travel ban, Exec. Order § 3(c), does not change this conclusion. The mere possibility that the Government may voluntarily relieve a party from an unlawful injury does not lessen the injury. In any event, there is no guarantee that Plaintiff's family will receive a waiver, and the Government has given no indication that it will provide one.

For the same reasons, the balance of equities strongly favors the entry of immediate relief. It is not hyperbole to say that such relief is a matter of life and death. By contrast, Defendants have no cognizable interest in continuing to implement an Executive Order that violates federal law and the Constitution. *See United States v. U.S. Coin & Currency*, 401 U.S. 715, 726 (1971); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Nor does Defendants' pretextual "national security" interest outweigh Plaintiff's interests, given the Executive Order's failure to advance that purported interest in a tailored way. *See supra* at 19– 20; *Trump*, 847 F.3d at 1168 (finding no harm to Government from stay of Executive Order because there is "no evidence that any alien from any of the countries named in the Order has perpetrated a terrorist attack in the United States").

## **CONCLUSION**

Plaintiff respectfully asks this Court to enter a temporary restraining order and a preliminary injunction prohibiting enforcement of the Executive Order against Plaintiff and requiring Defendants to finish processing Plaintiff's derivative asylum petition.

Dated: New York, New York
       March 10, 2017

Respectfully submitted,

By: _____/s/ Vincent Levy_____

HOLWELL SHUSTER & GOLDBERG LLP
Vincent Levy (vlevy@hsgllp.com)
Andrei Vrabie (avrabie@hsgllp.com)
Andrew Breidenbach (abreidenbach@hsgllp.com)
Matthew V.H. Noller (mnoller@hsgllp.com)
Lauren Giudice (lgiudice@hsgllp.com)
Sarah Sternlieb (ssternlieb@hsgllp.com)
Kevin Benish (kbenish@hsgllp.com) (*law clerk*
   *New York State Bar admission pending*)
750 Seventh Avenue, 26th Floor
New York, NY 10019
(646) 837-5151

PINES BACH LLP
Lester A. Pines, SBN 1016543
Tamara B. Packard, SBN 1023111
Alison TenBruggencate, SBN 1018869
122 West Washington Ave., Ste. 900
Madison, WI 53703
(608) 251-0101 (telephone)
(608) 251-2883 (facsimile)
lpines@pinesbach.com
tpackard@pinesbach.com
atenbruggencate@pinesbach.com

*Attorneys for Plaintiff*