UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| JOHN DOE,<br><br>                     Plaintiff,<br><br>                  -against-<br><br>DONALD J. TRUMP, as President of the United States of America; JOHN F. KELLY, as Secretary of the Department of Homeland Security; THE DEPARTMENT OF HOMELAND SECURITY; LORI SCIALABBA, as Acting Director of the U.S. Citizenship and Immigration Services; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; REX W. TILLERSON, as Secretary of State; U.S. DEPARTMENT OF STATE; and THE UNITED STATES OF AMERICA,<br><br>                     Defendants. | Civil Action No.: 17-cv-112<br><br>Chief Judge William M. Conley<br><br>**DECLARATION OF JOHN DOE IN SUPPORT OF HIS RENEWED APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

STATE OF WISCONSIN  )
                              ) ss.:
COUNTY OF DANE      )

       JOHN DOE, pursuant to 28 U.S.C. § 1746, declares as follows:

       1.     I am the Plaintiff in this action and make this declaration on the basis of my own personal knowledge.

       2.     I am a Sunni Muslim originally from Aleppo, Syria. *See* Named Decl. of John Doe in Support of his Renewed Application for a Temporary Restraining Order and Preliminary Injunction[1] ("Named Decl.") Ex. A at 2. I can be identified as Sunni by my family name.

---

[1] To be filed upon the Court's granting of Plaintiff's pending Motion to File Under Seal, filed March 10, 2017.

3. In 2011, I married my wife just as the first popular protests began in Aleppo, Damascus, and Daara. To support my family, I began managing my father's business, which required me to travel from our family home in one part of Aleppo to another part of the city where the business was located.

4. By the time our first child, a son, was born in 2012, Syria was in the midst of a full civil war. Aleppo was plunged into a humanitarian crisis, and our daily life was extremely difficult. Militias organized in and around Aleppo, and the security situation deteriorated. With police stations no longer functioning, rebel fighters were stealing cars and looting stores. Kidnappings for ransom were also becoming commonplace, as were incidents of rape and sexual assault on women.

5. By this time, armed militias had taken over different areas of Aleppo. While our home was in an area under the control of the Assad regime's al-Jaysh al-'Arabī as-Sūrī, or Syrian Arab Army ("SAA"), my family's businesses were in a region of Aleppo controlled by al-Jaysh as-Sūrī al-Ḥurr, or Free Syrian Army ("FSA"). The FSA is Sunni-aligned, while the SAA is Alawite. Consequently, the SAA came to suspect that Sunni Muslim civilians—including me—were FSA members or sympathizers. The FSA, meanwhile, came to suspect that civilians from SAA-controlled parts of Aleppo—including me—were SAA sympathizers.

6. The security situation made it impossible for me to commute from my home to my work. Road blocks and active shooting made it impossible to commute within Aleppo from SAA to FSA territory. Instead of a fifteen-minute drive to my father's business, I had to leave Aleppo altogether, circumvent the city, and reenter the FSA-controlled part of the city from a different road.

7. In June 2013, I attempted to visit my family's business. Because I had to

circumvent the city, the trip took approximately fifteen hours. When I arrived, I found that the FSA had commandeered my family's business. They forced me to pay them money for access to title and other legal documents located at the business. They also demanded that I pay them protection money. When I told them I could not, they attacked me with a knife and beat me so severely that I was hospitalized and received surgery. As a result, my abdomen is disfigured.

8. My parents and I subsequently obtained tourist visas to enter the United States. In September 2013, we came to the United States. My sister, a United States citizen, who now resides in the United States, also accompanied my parents and me. While here, my family stayed with my uncles, who are United States citizens and manage a family business here. *See* Named Decl. Ex. C at 2.

9. While in the United States in 2013, I was desperate to find a way to get my pregnant wife and one-year-old son out of Syria but could not.

10. I returned to Syria in January 2014 to see my new-born daughter, who had been born in November 2013. My return had to be in secret because I had been conscripted by the SAA but refused to fight for the Assad regime.

11. In February 2014, members of the SAA forced their way into my home and beat me. They wrongly suspected that I supported the FSA because I was Sunni and because SAA informants had reported seeing me in FSA-controlled territory in 2013. They did not believe me when I told them the truth—that I had to travel to that part of Aleppo to manage my family's business and support my family. After beating me, the SAA locked me in an underground prison and kept me there for two days. I had to pay them money in order for them to release me without beating me. SAA members also threatened to rape my wife.

12. By March 2014, my family's business was destroyed in the fighting between the

3

SAA and FSA. At this time, a subgroup within the FSA, Jabhat an-Nuṣrah li-ahli ash-Shām, or The Victory Front for the People of the Levant ("JN"), proclaimed that anyone that found me was permitted to kill me on sight. JN added me to a "wanted dead or alive" list that was displayed in the area of Aleppo where my family's business was located. The list identified me by my full name and by my parents' full names.

13. I fled to the United States that same month and requested asylum upon landing at Chicago O'Hare International Airport in late March 2014. *See* Named Decl. Ex. A at 1. USCIS officials determined that I had a credible fear of returning to Syria. *See* Named Decl. Exs. B–C.

14. During this time, single women in our neighborhood in Aleppo were being raped, killed, and kidnapped if they did not have a husband or father at home to protect them. With me gone, my wife moved with my children to stay with family in a different neighborhood. Tragically for my family, this neighborhood became a battleground between the FSA and SAA.

15. In April 2014, I applied for asylum with USCIS. *See* Named Decl. Ex. D. I also tried to find a way to bring my wife and children to safety here.

16. With the security situation in Aleppo deteriorating, I filed a motion to have my pending asylum application expedited, but that request was denied in March 2015. *See* Named Decl. Ex. E.

17. In the spring and summer of 2015, my wife and children were living under increasingly dangerous conditions. In addition to the SAA's threats of rape, my wife and children were living along the frontline of a battle between the FSA and SAA.

18. The house where my family was hiding was repeatedly struck by small-arms fire and shrapnel from artillery, and bombings in our neighborhood were commonplace. Named Decl. Ex. F at 20–22, 33–41. During one such attack between late May and early June, debris

4

struck my son, breaking his arm.  *See* Named Decl. Ex. F at 42.

19. In July 2015, the home was hit with artillery fire.  While attempting to seek shelter, my three-year-old son fell three stories and died.  I could not travel to mourn with and comfort my wife and daughter.  Given the security situation, he could not be given a proper burial, and his remains had to be hastily buried in an unmarked grave in a nearby public park.  *See* Named Decl. Ex. F at 43–44.

20. In October 2015, I submitted an amended asylum application with USCIS.  *See* Named Decl. Ex. G.  That application was granted in May 2016 by the Immigration Court in Chicago, and the asylum became final in June 2016.  *See* Named Decl. Ex. H.  The Immigration Court ruled that sending me back to Syria would violate the Immigration and Naturalization Act as well as the United Nations Convention Against Torture.  *See* Named Decl. Ex. H.

21. Receiving the Immigration Court's ruling in May 2016 was one of the most memorable moments of my life.  I was finally reunited with my sisters, mother, and uncles in a safe and welcoming country.  I was able to find a job through which I can support myself and my family.  I regularly attend a local mosque here in Madison, Wisconsin, and I live with my elderly mother in Wisconsin. I felt, and continue to feel, so deeply grateful and relieved that the United States has given me the opportunity to live in security and freedom here.  Yet, at the same time, I was terribly afraid for my wife and surviving daughter and I am desperate to get them to safety.

22. I filed a request for derivative asylum status with USCIS on behalf of my wife and surviving daughter in early July 2016.  *See* Named Decl. Ex. I.  My wife is a good person and is eager to contribute to American society.  She has never engaged in acts of oppression against any person on the basis of race, gender, sexual orientation, or religion.  The same is true of my daughter, who is being raised to never engage in such acts.

5

23. My derivative asylum application was forwarded to the USCIS processing center in Nebraska, which found it to be in order. It was then forwarded for processing to the USCIS's Milwaukee office for a background check, which was also approved. I filed this action after being informed that USCIS was no longer processing my petitions.

24. My wife and three-year-old daughter still reside in war-torn Aleppo.

25. I have been informed that USCIS has completed review of my petitions and that they have been approved. But the process is not over. My wife and daughter will not receive travel documents until a USCIS or consular officer interviews them in person in Amman, Jordan and deems them eligible to travel to the United States.

26. Without these travel documents, my wife and daughter cannot travel to the United States because they are not lawful permanent residents, admitted or parole foreign nationals, travel document holders, dual nationals, diplomatic visa holders, asylees, or individuals who have been granted withholding of removal, advance parole, or protection under the Convention Against Torture.

27. Since February 24, I have finalized arrangements for the (very dangerous) transport of my wife and daughter to Amman, Jordan. But they cannot leave Syria until they are officially invited for an interview at the U.S. Embassy in Amman, because only then will border authorities permit them to cross into Jordan. Now that the Executive Order has been re-issued, I fear that invitation will never come.

28. In the meantime, my wife and daughter remain in hiding in Aleppo, where deadly fighting continues unabated. In late February, for example, Free Syrian Army forces bombed the neighborhood where my wife and daughter live.

29. I have suffered a great deal to date through the tragic death of my son and the

physical and emotional pain to which I have been subjected by the SAA and FSA. Our family's home and business in Aleppo have been decimated. And I check Syrian news sites obsessively and with dread, fearful of reading of the final attack that ends my wife's or daughter's life. The security and humanitarian situation in Syria is a nightmare. My wife and daughter are homebound, too afraid of SAA checkpoints to leave their shelter. My daughter is suffering from tonsillitis, but lacks access to adequate medical care for what was once a routine operation in Syria.

30. In short, I am desperately afraid for them and spend many days in a fog of despair. The only goal that keeps me moving forward is the hope that I will be reunited with my wife and my daughter, and I hope with all my heart that they will be safely here with me in the United States, my new home.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: on this 10th day of March, 2017.   _____
                                              John Doe